**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 06-1107**

OLIVIA WALLER, Administrator of the Estate of
Rennie Edward Hunt, Jr., deceased,

        Plaintiff - Appellant,

    versus

CITY OF DANVILLE, VIRGINIA, a Municipal
Corporation; T. NEAL MORRIS, Chief of Police
of the City of Danville, Virginia, in both his
individual and official capacities; DAVID
STOWE; HUGH WYATT; GERALD FORD; TODD BROWN;
DENNIS HALEY; JONATHAN GRAHAM; B. C. ELLIOTT;
WILLIAM CHANEY; KENNETH FITZGERALD, in both
their individual and official capacities as
City of Danville Police Officers; JOHN DOES,
Police Officers of the City of Danville Police
Department, the identity and number of whom is
presently unknown; RICHARD ROES, Supervisory
police officers of the City of Danville, the
identity and number of whom is presently
unknown, in both their individual and official
capacities,

        Defendants - Appellees,

    and

CHRISTOPHER TILLMAN; JASON PRESLEY, in their
individual and official capacities as City of
Danville Police Officers,

        Defendants.

--------------------------------------------------

NATIONAL MENTAL HEALTH ASSOCIATION,

Amicus Supporting Appellant.

———————————

Appeal from the United States District Court for the Western District of Virginia, at Danville.  Jackson L. Kiser, Senior District Judge.  (4:03-cv-00039-jlk)

———————————

Argued: September 19, 2006          Decided: December 14, 2006

———————————

Before WILKINSON, MOTZ, and TRAXLER, Circuit Judges.

———————————

Affirmed in part, reversed in part, and remanded by unpublished opinion.  Judge Traxler wrote the majority opinion, in which Judge Motz joined.  Judge Wilkinson wrote an opinion concurring in part and dissenting in part.

———————————

**ARGUED:** Lani Rae Miller, O'MELVENY & MYERS, L.L.P., Washington, D.C., for Appellant.  Martha White Medley, DANIEL, MEDLEY & KIRBY, P.C., Danville, Virginia, for Appellees. **ON BRIEF:** Janell M. Byrd, THE COCHRAN FIRM, Washington, D.C.; Toby Heytens, Jason A. Abel, O'MELVENY & MYERS, L.L.P., Washington, D.C., for Appellant.  James A. L. Daniel, M. Brent Saunders, DANIEL, MEDLEY & KIRBY, P.C., Danville, Virginia, for Appellees.  Joseph R. Guerra, Matthew B. Hsu, SIDLEY AUSTIN, L.L.P., Washington, D.C., for Amicus Supporting Appellant.

———————————

Unpublished opinions are not binding precedent in this circuit.

TRAXLER, Circuit Judge:

Plaintiff-Appellant Olivia Waller, individually and as administrator of the estate of her brother Rennie Edward Hunt, Jr., brought this action under 42 U.S.C.A. § 1983 (West 2003), against the City of Danville and several of its police officers, claiming violations of the Fourth and Fourteenth Amendments to the United States Constitution in connection with the May 11, 2002, shooting death of Hunt. Plaintiff also sought to recover damages under Virginia's wrongful death and survival statutes, and for assault and battery, intentional and negligent infliction of emotional distress, and gross negligence under Virginia state law. Plaintiff claims that Hunt was unlawfully seized, subjected to excessive and unreasonable force, and discriminated against on the basis of his race and mental disability. The district court granted summary judgment to the defendants on all claims, and plaintiff appeals. For the following reasons, we affirm in part, reverse in part, and remand for further proceedings.

I.

The pertinent facts, viewed in the light most favorable to the plaintiff, see Saucier v. Katz, 533 U.S. 194, 201 (2001), are as follows.

On the evening of May 10, 2002, emergency services for the City of Danville received a 911 call from Teressa Jennings. Jennings reported that she was concerned about her friend and neighbor, Virginia Evans, because she had not seen or heard from Evans since Evans's live-in boyfriend, Rennie Hunt, had been released from a recent hospitalization for psychiatric problems. Hunt was known to be approximately 5'5" tall, 137 pounds, and 67 years old. He was retired and walked with a cane.

City of Danville police officers Christopher Tillman, Jason Presley, and Eric Ellis were dispatched to Hunt's apartment to check on Evans. When the officers arrived at the apartment and met Jennings, Jennings told them that she had not seen or heard from Evans for a couple of days and that, when she inquired as to Evans's whereabouts, Hunt had come to their apartment door, "speaking about dead bodies in the street and acid in the backyard" and refused to let Jennings see Evans. J.A. 49. The officers knocked at the front and back doors, repeatedly identifying themselves as the Danville police. Hunt responded either that he was "going to kick [their] ass" or "kiss his ass." J.A. 54. The officers told Hunt that they were there to check on Evans, but Hunt told the officers "not to be concerned with" her. J.A. 55. When the officers asked Evans to open the door, she responded, "I can't come to the door. He won't let me." J.A. 55. When asked by the

4

officer if she was all right, Evans replied through the door that she was okay.

The officers contacted their supervisor, Captain David Stowe, for guidance. Stowe came to the scene, identified himself to Hunt as a police officer, and told Hunt that they were concerned about Evans. Hunt again responded "[y]ou don't need to be concerned with Virginia." J.A. 555. When Stowe persisted, Hunt repeatedly told him that "[i]f you come in here, I've got something for you." J.A. 556. Hunt also told Stowe that he was "not going to be sprayed in the face," which Stowe believed to be a reference to mace. J.A. 557. Stowe testified that, based on Hunt's comments, he believed Hunt had a weapon and that a confrontation would occur if they attempted to enter the apartment.

Unable to obtain cooperation from Hunt and having heard nothing further from Evans, Stowe returned to the police department to confer with Captain Kenneth Fitzgerald about the situation. The officers checked Hunt's criminal history and learned that Hunt had been arrested in the past for drunk and disorderly conduct, resisting arrest, and, most recently, domestic assault upon Evans. After consulting Assistant Police Chief B.C. Elliott about the situation, the officers decided to contact Lieutenant Hugh Wyatt, a hostage negotiator, for assistance. In the meantime, Stowe was in contact by telephone with Officer Presley, who was still at the

5

scene. Officer Presley informed Stowe that Evans's sister had arrived at the apartment and confirmed that she also had not heard from Evans in several days. Evans's sister also advised the officers that Hunt "had been in and out of mental institutions" and "at one time she had been to the house and he had come to the door with a knife in his hand." J.A. 85.

Shortly thereafter, Lieutenant Wyatt, accompanied by Captain Stowe and Officer Tillman, approached the back door of the apartment to begin negotiations. When Wyatt attempted to coax Hunt into letting him speak with Evans, Hunt responded that "[y]ou ain't got to worry about her. Go on and get the hell away." J.A. 119-20. When Wyatt persisted, Hunt yelled at Wyatt, "I'm going to blow your goddamned head off." J.A. 120. Deeming it unsafe to continue negotiations from the open area at the back door, the officers immediately retreated and returned to the front of the building.

Until this point, the officers had expressed some indecision as to whether they had probable cause for a warrantless entry into the apartment to secure Evans's safe exit. Hunt's direct threat to Lieutenant Wyatt and obvious reference to a firearm eliminated this indecision and the officers began the process for obtaining an arrest warrant for Hunt. Based upon Hunt's threat to Lieutenant Wyatt, and the narrowness of the hallway leading to the front door of Hunt's apartment, the officers decided that the Emergency

6

Response Team ("ERT") should handle the arrest of Hunt and removal of Evans from the apartment.

The ERT was summoned and an operational plan was prepared. The members of the team consisted of Officer Dennis Haley (the team leader), and Officers Gerald Ford, Todd Brown, William Chaney, Jonathan Graham, and Mark Haley. According to the plan, Officer Chaney was to knock and announce to Hunt the presence of the police and that they had a warrant for his arrest. If Hunt failed to cooperate, Officer Graham was to deploy a flash-bang device[1] at the rear of the apartment to distract Hunt from the front entrance and Officer Chaney was to breach the front door with a battering ram to force entry. Due to the narrowness of the hallway, the officers could only enter the apartment single-file.[2] Officer Ford was to enter as the lead officer, carrying a bullet-proof shield for protection. Officer Brown was to follow Officer Ford, providing cover and assistance to him. Their job was to seize Hunt. Officer Dennis Haley was to enter third, as backup to Ford and Brown, and

---

[1]A flash-bang device is a non-destructive diversionary device that produces a loud noise, bright flash, and smoke when it is deployed.

[2]The operational plan took into account the preexisting knowledge of the Danville police officers gained from prior calls regarding Hunt and the layout of the apartment. They knew, for instance, that entry had to be made through the front door due to a barricade across the back door and that the narrowness of the hallway would increase the risk to the officers.

to deploy a second flash-bang device upon entry. Officer Mark Haley was to enter fourth, locate Evans, and remove her from the apartment. Officer Chaney, who would have dropped back after breaching the door if necessary, would enter last.

Lieutenant Wyatt videotaped the briefing of the ERT and portions of their subsequent entry into the apartment. As evidenced by this videotape and the uncontroverted testimony of the officers, Officer Chaney repeatedly announced to Hunt that they were police officers and informed Hunt that they had a warrant for his arrest. When Hunt did not respond after repeated requests, Officer Graham deployed the flash-bang device at the rear door to distract Hunt from the front entrance while Officer Chaney broke down the front door. However, the ERT encountered a second, unexpected, locked door to the apartment, at the end of the hallway. Because Officer Chaney had fallen back and was unable to quickly return to this second door, Officer Ford broke through the door with his shoulder. Officer Dennis Haley simultaneously deployed a second flash-bang device, adding an additional layer of protection for Officer Ford and the other officers as they entered the doorway.

According to the officers, when they breached the second doorway into the apartment, Hunt rushed towards them yelling and swinging what appeared to be a metal pole with a blade at the end

8

in one hand and a knife in the other hand.  The officers described the first weapon as "a pole with a hooked end that looked like a culling-type object, like what some people would refer to as [a] sickle-type pole," J.A. 204, "what years ago people used to cut grass with or clear an area with," J.A. 206.  Officer Ford backed up, yelling for Hunt to put the object down and yelling to the others that Hunt had a knife.  As he was backing up and yelling, Officer Ford also fired two or three shots towards Hunt.  Hunt dropped the pole, but immediately picked it up and charged towards Officer Ford again, this time striking him in the shield and helmet.  When Hunt made his second charge, Officers Ford, Brown and Dennis Haley all began firing shots.  The shots knocked Hunt backwards, through the doorway into an adjoining bedroom.  Hunt was transported to the hospital but died soon thereafter.  It was later determined that the object Hunt was wildly swinging was a modified walking cane with a retrofitted handle.  A screwdriver, which could have been the perceived weapon in his other hand, was found nearby.

II.

Plaintiff brought this action against the City of Danville, Police Chief Morris, Captain Stowe, Captain Fitzgerald, and Lieutenant Wyatt, five of the six ERT members (Dennis Haley, Gerald Ford, Todd Brown, Jonathan Graham, and William Chaney), and two of

the three officers who initially responded to the scene (Officers Tillman and Presley), alleging fifteen separate claims for violations of Hunt's rights under the Fourth and Fourteenth Amendment, the Americans with Disabilities Act, see 42 U.S.C.A. §§ 12131-12134 (West 2005), and the Rehabilitation Act, see 29 U.S.C.A. § 794 (West 1999 & Supp. 2006), and various claims under state law.

Counts I through III of the complaint set forth claims against the City of Danville and the individual supervisory officers in their official capacities. See Monell v. Dep't of Social Services, 436 U.S. 658, 694 (1978) (holding that a municipality may be held liable for damages for violations of an individual's constitutional rights by its agents or employees committed pursuant to municipal policy or custom). Count I alleges that the officers, acting pursuant to the City's policies and customs, unlawfully arrested Hunt, used unreasonable and excessive force, and subjected Hunt to discriminatory treatment on the basis of his mental illness and race, in violation of Hunt's Fourth And Fourteenth Amendment rights. Count II alleges that the City's decision to use the ERT to break into Hunt's residence reflected deliberate indifference and reckless disregard to a substantial and obvious risk of serious injury to Hunt. Count III alleges that the City developed and maintained a policy of deficient training of its police force in

10

the use of force, including the use of force by the ERT and the use of force with mentally ill persons. Count VIII of the complaint asserts a claim for supervisory liability against Chief Morris and other unnamed supervisory personnel arising from the actions of the officers in obtaining and serving the arrest warrant.

Counts V, VII, IX, and X of the complaint set forth various causes of actions against the individual defendants in their individual capacities, alleging that they subjected Hunt to unreasonable and excessive force (Count V), conspired to use unreasonable and excessive force (Count VII), failed to intercede to prevent the use of excessive and unreasonable force (Count IX), and subjected Hunt to false arrest (Count X). State law claims for assault and battery related to the shooting (Count XI), intentional and negligent infliction of emotional distress (Count XII), gross negligence (Count XIII), survival (Count XIV), and wrongful death (Count XV), are also asserted against the individual defendants.

Finally, the complaint sets forth two claims of discrimination. Count IV alleges a claim of disability discrimination under the ADA and Rehabilitation Act against the City of Danville, based upon the allegation that the City discriminated against Hunt due to his mental disability in unlawfully arresting him, approving an excessive and unreasonable use of force against him, and failing to train the officers in the

appropriate and reasonable police practices under the circumstances. Count VI alleges a separate claim of race discrimination under the Equal Protection Clause against the individual defendants, alleging that they subjected Hunt to discriminatory treatment on the basis of race by treating similarly situated white persons in a substantially different and more favorable manner than Hunt.

At the outset of the case, the district court issued an order limiting discovery solely to matters related to the issue of whether qualified immunity should be granted to the individual officers on the claims brought against them. The effect of this limitation was to allow plaintiff full discovery regarding the events that spanned the evening of May 10 and the early morning of May 11, but prohibiting unfettered discovery on the policies, customs, or training practices of the City of Danville and on plaintiff's claims of disability and race discrimination.

In November 2004, the individual officers filed a motion for partial summary judgment with respect to plaintiff's § 1983 claims for false arrest and excessive force under the Fourth Amendment. The district court granted the motion. With regard to the false arrest claim, the district court ruled that the officers had acted pursuant to a facially valid warrant, had probable cause to arrest Hunt, and were justified in entering the apartment by an exigent

12

need to check on Evans.  With regard to the excessive force claim, the district court found that the force employed by the individual officers was not disproportional and that they had acted objectively reasonably in light of the circumstances confronting them.  The court ordered discovery to proceed on the remaining issues.

In August 2005, however, defendants filed another motion for summary judgment, arguing that -- although no further discovery had taken place -- the district court's findings and rulings on the prior Fourth Amendment claims were dispositive of each of plaintiff's additional claims.  Plaintiff opposed the motion and filed a motion to compel discovery on the remaining claims.  In the meantime, the district court granted plaintiff's motion to dismiss Officers Tillman and Presley without prejudice because they did not utilize force against Hunt and they were not decisionmakers whose actions allegedly led to the shooting of Hunt.

In December 2005, the district court granted the remaining defendants' motions for summary judgment, concluding that the lack of a Fourth Amendment false arrest or excessive force violation mandated that all remaining claims be dismissed.  Plaintiff's request for additional discovery was dismissed.  This appeal followed.

III.

We begin with plaintiff's appeal from the district court's order granting summary judgment to the individual officers on the claim that they violated Hunt's Fourth Amendment right to be free from unreasonable and excessive force, as well as the derivative claims brought against the City of Danville and its supervisory officials for these alleged violations.[3] Plaintiff argues that the ERT officers lacked justification for using lethal force against Hunt because they outnumbered him five to one, were much larger, younger, and healthier men, and were faced with an unarmed suspect. Under the circumstances, plaintiff argues, no reasonable officer in the position of an ERT member could have believed himself or others to have been in imminent danger of serious harm. We disagree.

A.

Under the doctrine of qualified immunity, police officers performing their discretionary duties "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Because "[q]ualified immunity is an

---

[3]Because plaintiff has not appealed the district court's ruling dismissing her false arrest claims, our remaining discussion focuses only upon the claims of excessive force and discrimination.

14

entitlement not to stand trial or face the other burdens of litigation . . . rather than a mere defense to liability," it is important to "resolv[e] immunity questions at the earliest possible stage in litigation." Saucier, 533 U.S. at 200-01 (internal quotation marks omitted). When qualified immunity is asserted, the court must consider the requisites of the defense in the proper sequence. We must first evaluate whether, viewing the facts in the light most favorable to the plaintiff, the officer has violated a constitutional right; if so, we then proceed to determine whether that right was clearly established at the time of the violation. See id. at 201.

A claim that a police officer used excessive force during an arrest is analyzed under the Fourth Amendment and its reasonableness standard. An officer's actions are not excessive if they "are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989). "The intrusiveness of a seizure by means of deadly force is unmatched." Tennessee v. Garner, 471 U.S. 1, 9 (1985). But deadly force may be employed "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Id. at 11. "[I]f the suspect threatens the officer with a weapon or there is probable cause to

15

believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." Id. at 11-12. Additionally, "[b]ecause 'police officers are often forced to make split-second judgments –– in circumstances that are tense, uncertain, and rapidly evolving,' the facts must be evaluated from the perspective of a reasonable officer on the scene, and the use of hindsight must be avoided." Waterman v. Batton, 393 F.3d 471, 476-77 (4th Cir. 2005) (quoting Graham, 490 U.S. at 397) (internal citation omitted).

Determining the reasonableness of the challenged actions "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (internal quotation marks omitted). A proper assessment of "the objective reasonableness of force is to view it in full context, with an eye toward the proportionality of the force in light of all the circumstances. Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness." Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994). Proper application of the test of reasonableness also "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue,

16

whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. Ultimately, "the question is 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure.'" Id. (quoting Garner, 471 U.S. at 8-9).

B.

Like the district court, we are satisfied that a reasonable officer in the position of the ERT members could have believed that Hunt posed a significant threat of serious physical harm to them, as well as to Evans, thus justifying the use of deadly force.

At the time of the officers' entry into the apartment, Hunt and Evans had not been seen for days, friends and family of Evans were concerned about her well-being, and Hunt had a recent arrest for domestic assault upon Evans. Although Evans told the officers early-on in the course of events that she was okay, this was immediately upon the heels of her telling the officers that Hunt would not let her come to the door and Evans made no further communication with the police.

Hunt had also given the officers reasonable grounds to believe that he had a weapon and was prepared to use it. Hunt repeatedly told Officer Stowe that "[i]f you come in here, I've got something for you." J.A. 72. And, when Lieutenant Wyatt, the hostage

17

negotiator, attempted to converse with Hunt, Hunt told Wyatt to "get the hell away," and threatened to "blow [his] goddamned head off." J.A. 120. This was sufficient to give the officers probable cause to believe that Hunt was armed, and that the ERT, with its specialized training, should serve the warrant for Hunt's arrest and remove Evans from the apartment.

As evidenced by the videotape, the ERT repeatedly identified themselves to Hunt and announced that they had a warrant for his arrest before forcing entry. When they entered the smoke-filled, dark apartment, Hunt immediately charged at the agents with what they reasonably perceived to be a sickle-type rod or pipe and a screwdriver which the officers perceived to be a knife. Momentarily halted by the first round of shots fired by Officer Ford, Hunt picked up the cane and charged at the officer a second time, striking Officer Ford's shield and helmet with the modified cane. Three of the officers began firing, this time with deadly consequence.[4]

---

[4]On appeal, plaintiff contends that there is a genuine issue of material fact as to whether Hunt had the screwdriver in one hand because it was found near a toolbox, and as to whether Hunt actually struck Officer Ford because there was no paint transfer on the helmet or shield. We disagree. The lack of paint transfer and ultimate location of the screwdriver is insufficient to contradict the otherwise unrefuted testimony of several officers that Hunt struck Officer Ford and that they perceived that Hunt possessed a weapon in each hand as he charged towards Ford during that split-second interval.

18

Under the totality of the circumstances, we are satisfied that a reasonable officer would have believed that Hunt had a weapon (including a gun and probably a knife), that he was holding Evans against her will and refusing to allow her free movement, and that he was an immediate threat to the officers and to Evans. Informed by this information and presented with the undisputed conduct of Hunt in the volatile atmosphere with which they were faced, we conclude that the split-second decision on the part of the ERT to fire upon Hunt was a reasonable and proportional one. See Sigman v. Town of Chapel Hill, 161 F.3d 782, 788 (4th Cir. 1998) (concluding that an officer's decision to fire is not unreasonable "[w]here an officer is faced with a split-second decision in the context of a volatile atmosphere about how to restrain a suspect who is dangerous, who has been recently -- and potentially still is -- armed, and who is coming towards the officer despite officers' commands to halt").

C.

We pause here to note that the plaintiff only challenges the district court's determination that the ERT members were entitled to qualified immunity, arguing that no reasonable officer in their position would have viewed Hunt as a threat to themselves or Evans. The National Mental Health Association, via amicus brief, urges us to also consider the conduct of the other defendants, and their

19

decision to utilize the ERT in the first instance to serve the warrant, in our evaluation of the totality of the circumstances. Specifically, they argue that the "totality of the circumstances" approach in the excessive force context should include consideration of the fact that the Danville police officers, and in particular the supervisory officials, provoked and precipitated the violent confrontation with Hunt.

Although circuits differ on the question of how pre-shooting conduct should be weighed in an excessive force case, this circuit has repeatedly held that such conduct is generally not relevant and is inadmissible. See Waterman, 393 F.3d at 477 (holding that the "reasonableness of the officer's actions in creating the dangerous situation is not relevant to the Fourth Amendment analysis; rather, reasonableness is determined based on the information possessed by the officer at the moment that force is employed"); Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) (noting that "[t]he court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection"); Greenidge v. Ruffin, 927 F.2d 789, 792 (4th Cir. 1991) (rejecting the "argument that, in determining reasonableness, the chain of events ought to be traced backward to the officer's misconduct of failing to comply with the standard police procedures"). Furthermore, the conduct challenged

by amicus was not conduct engaged in by the members of the ERT. The ERT members were not involved in the decision-making process which led to their deployment, but rather possessed the sole objective to serve the warrant for Hunt's arrest and secure the safe recovery of Evans from the apartment as ordered by their superiors. Thus, the conduct of the supervising officers is not relevant to a determination of the reasonableness of the ERT's conduct in employing deadly force in the circumstances facing them, or their liability for the use of such force.

D.

For the foregoing reasons, we hold that the use of deadly force by the ERT members was objectively reasonable and not disproportional in light of the facts and circumstances presented to the officers at the time. Counts VII and IX, which allege, respectively, that the individual defendants conspired with one another to deprive Hunt of his constitutional right to be free from unreasonable and excessive force and failed to intercede to prevent the use of excessive and unreasonable force, fail for the same reason. Accordingly, we affirm the district court's grant of summary judgment for defendants as to Counts V, VII, and IX of the complaint.

We likewise affirm the district court's grant of summary judgment as to plaintiff's Monell claims brought under the Fourth

21

Amendment. Plaintiff's contends that, because the individual officers violated Hunt's Fourth Amendment rights, she was entitled to discovery on her Monell claims, i.e., that the policies and procedures of the supervisory defendants caused the deprivation of Hunt's Fourth Amendment rights by the individual officers. We disagree. Although the district court's discovery order did prohibit plaintiff from fully inquiring into the policies and customs of the Danville Police Department, plaintiff cannot, as a matter of law, prevail on her claim that these constitutional rights were violated pursuant to a municipal "policy or custom" because we have found that Hunt was not subjected to an unlawful seizure or unreasonable force under the Fourth Amendment by the individual defendants in the first instance. See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.").

Plaintiff's supervisory liability claims against Chief Morris, and other unnamed supervisory defendants, fail for the same reason. Because these claims are dependent upon plaintiff's claim that the ERT members used excessive force against Hunt, "liability cannot be placed on either the non-shooting officers, a supervisor, or the

22

City." Hinkle v. City of Clarksburg, 81 F.3d 416, 420 (4th Cir. 1996); see also Sigman, 161 F.3d at 788. Accordingly, we also affirm the district court's grant of summary judgment to the defendants on Counts I, II, and III, insofar as they allege claims arising from the use of excessive force, and on Count VIII.[5]

IV.

We turn now to consider plaintiff's claim that the district court erred in granting summary judgment with respect to her claims of disability and race discrimination.

In Count IV of the complaint, plaintiff alleges that the City of Danville knew that Hunt suffered from mental illness and discriminated against him due to his disability by arresting him, approving the aggressive use of force against him, and failing to train its officers in the appropriate and reasonable police practices under the circumstances. The crux of the disability discrimination claim appears to be that, given Hunt's known mental illness, the officers should have handled him differently than they would have handled non-mentally ill suspects in similar circumstances. For example, plaintiff argues that the officers should have either contacted mental health professionals for

_____

[5]We address below Count I's allegation that the City's policies subjected Hunt to discriminatory treatment on the basis of his mental illness and race.

23

assistance in dealing with the barricaded-persons situation at hand and, more generally, should have approached Hunt in a less aggressive manner. In other arguments, however, plaintiff seems to advance a somewhat different claim, i.e., that the ADA's prohibition against discrimination was violated because the officers treated Hunt worse than they would have treated a similarly-situated non-disabled person.

In Count VI of the Amended Complaint, plaintiff alleges an Equal Protection claim against Chief Morris, and other unnamed officers in their individual capacities, under the Fourteenth Amendment, claiming that the officers subjected Hunt to discriminatory treatment on the basis of his race by treating similarly situated white persons in a substantially different and more favorable manner than Hunt was treated.

The district court rejected both discrimination claims, but did so based solely upon its earlier determination that the officers did not violate Hunt's Fourth Amendment right to be free from unreasonable and excessive force and its determination that, because such actions were constitutionally permissible under the Fourth Amendment, they were also legally permissible under the ADA and Equal Protection Clause. Plaintiff contends that an adverse determination on the Fourth Amendment claim is not necessarily determinative of the discrimination claims and that we should, at

24

a minimum, remand the case for further proceedings as to these claims.  We agree.

A.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subjected to discrimination by any such entity."  42 U.S.C.A. § 12132.  In <u>Bates v. Chesterfield County</u>, 216 F.3d 367 (4th Cir. 2000), we addressed a claim for violation of a plaintiff's Fourth Amendment right to be free from unreasonable seizure, along with a claim that he was discriminated against on account of his disability in violation of the ADA.  Bates asserted that the officers "should have been aware of his autism" during the challenged "incident and should have taken this condition into account when interacting with him."  <u>Id.</u> at 373.  Had they done so, Bates argued, "he would not have been detained or arrested and the ensuring scuffle would not have occurred."  <u>Id.</u>  Having rejected the excessive force claim, we rejected the ADA claim as well, but not on the merits of whether the claim could be brought in this context.  Rather, we held that:

> [w]e need not undertake an independent ADA inquiry in this case because our Fourth Amendment scrutiny has already accounted for all the situation's circumstances. For in evaluating the validity of an investigatory stop, a court must consider the totality of the circumstances -

25

the whole picture. And in examining a claim of excessive force a court must ask whether the officers' conduct was objectively reasonable in light of the facts and circumstances confronting them. Just like any other relevant personal characteristic -- height, strength, aggressiveness -- a detainee's known or evident disability is part of the Fourth Amendment circumstantial calculus.

Id. at 373 (internal citations and quotation marks omitted). Ultimately, we upheld dismissal of the ADA claim because the evidence established that the seizure was "not by reason of Bates' disability, but because of Bates' objectively verifiable misconduct. Such reasonable police behavior is not discrimination." Id. It was "because of" a legitimate law enforcement purpose rather than "because of [a] disability." Id.

This case, however, stands on a different footing than Bates. The precise nature of the discrimination claim is not clear to us, nor have the merits of the claim been briefed to either this court or the district court. However, plaintiff has also been prohibited from conducting discovery into her allegations of disability discrimination -- regardless of whether that claim is that the City of Danville should have treated Hunt differently because of his mental illness or that the City of Danville treated Hunt less favorably than his non-mentally ill counterparts in similar circumstances. No doubt, as we held in Bates, the officers were entitled to take Hunt's mental illness into account during their

encounter with Hunt. And it certainly appears that the officers sought to seize Hunt not because of his mental illness but because of his "objectively verifiable misconduct" towards the officers and Evans. However, given the existing record and the lack of any meaningful briefing on the issue, we cannot say that there is no set of facts from which an ADA violation could be found simply because we have concluded that there has been no Fourth Amendment violation by the ERT members.

In sum, we express no opinion as to the parameters of plaintiff's ADA claim, whether the ADA would apply to the facts of this case or the claim as ultimately defined, or the ultimate merits of any such claim. Rather, given the existing record and the posture of the claims on appeal, we think it more prudent to remand for further delineation of the discrimination claims by the plaintiff, inquiry by the district court and, if necessary, discovery into the claims as articulated by plaintiff.

B.

We reach the same conclusion with regard to plaintiff's claim of race discrimination against the individual officers. There is no indication that the officers' actions towards Hunt were tainted by any race-based motivations, nor any evidence that Hunt was treated differently from similarly-situated white suspects. Plaintiff's counsel was unable to articulate any particular basis

27

for this claim at argument, and it does not appear likely from the existing record that discrimination was the motivating factor behind the officers' actions. Nevertheless, because the district court restricted discovery to Fourth Amendment issues related to the shooting and the events immediately preceding it, plaintiff has been foreclosed from any opportunity to investigate her claim that, even if the force employed was not excessive for purposes of the Fourth Amendment, white persons in substantially similar situations have been treated in a less aggressive and more favorable manner. Accordingly, we are also compelled to reverse and remand this claim for further evaluation. To the extent plaintiff's Monell claims rest upon these same allegations of race and disability discrimination, we remand those portions of the claims for further evaluation as well.

V.

Plaintiff's final challenge is to the district court's grant of summary judgment on her state law claims for assault and battery related to the shooting, intentional and negligent infliction of emotional distress, gross negligence, survival, and wrongful death. As in the case of the Monell claims, plaintiff argues only that we should reverse summary judgment as to the state law claims because the individual officers violated Hunt's Fourth Amendment right to

28

be free from excessive and unreasonable force and because no independent discovery was conducted on the state law claims. To the extent plaintiff's state law claims are premised upon plaintiff's allegations that the officers employed excessive force against Hunt or engaged in an unlawful arrest of him, we affirm the district court's grant of summary judgment. To the extent they are premised upon plaintiff's allegations of discriminatory conduct, we remand for an evaluation of the claims, and discovery if necessary, along with the federal discrimination claims.

VI.

For the foregoing reasons, we reverse the district court's order granting summary judgment to the defendants on plaintiff's claims of race and disability discrimination under § 1983, as well as plaintiff's state law claims to the extent they are based upon the allegations of race and disability discrimination, and remand for further proceedings. The remainder of the district court's order granting summary judgment to the defendants is affirmed.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

29

WILKINSON, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's disposition of the excessive force claims and would affirm the judgment of the district court across the board. Indeed, the majority makes such a fine and thoughtful case for affirmance that it would surprise any reader to learn that this litigation is not at an end. The City of Danville police officers who confronted Rennie Edward Hunt, Jr., responded commendably to the apparent hostage situation, as the majority opinion makes clear. Additional proceedings on disability and race discrimination claims can amount under the circumstances to no more than a fishing expedition.

I find no fault with the majority's description of the situation that the defendants confronted on May 11, 2002. When Danville police officers arrived at Hunt's apartment in response to a 911 call from a neighbor, neither Hunt nor his girlfriend, Virginia Evans, had been seen in the several days since Hunt's return from a psychiatric hospitalization. Maj. Op. at 4, 16. Evans's friends and family expressed concern about her well-being. Id. at 16. Evans herself told police that Hunt, who had recently been arrested for domestic assault against Evans, refused to let her come to the door. Id. at 16-17. And while she initially told the officers that she was okay, she soon

ceased to respond to their attempts to contact her in order to ensure that she was safe. Id.

Hunt's own statements to the officers did nothing to dispel fears of the worst. As the majority writes, Hunt gave the officers "reasonable grounds to believe that he had a weapon and was prepared to use it," telling one officer "[i]f you come in here, I've got something for you," and threatening to "blow [the] goddamned head off" of another. Id. at 17.

Danville Police Department officials reasonably elected to deploy the City's Emergency Response Team to the building. After repeatedly identifying themselves and stating that they had a warrant for Hunt's arrest, members of the team forced entry into the apartment. Id. Hunt's actions in the "smoke-filled, dark" space gave the officers additional cause to fear for Evans's safety and their own. Id. "Hunt immediately charged at the agents with what they reasonably perceived to be a sickle-type rod or pipe and a screwdriver which the officers perceived to be a knife." Id. Officer Ford fired two or three shots from his weapon, at which point Hunt picked up his cane and charged at the officers again, hitting Officer Ford's shield and helmet. Id. at 9, 17-18. During this second charge, three officers fired at Hunt. Id. at 9.

31

Under these circumstances, as the majority notes, the officers' use of deadly force, though tragic, was reasonable and proportional, because "a reasonable officer would have believed that Hunt had a weapon (including a gun and probably a knife), that he was holding Evans against her will and refusing to allow her free movement, and that he was an immediate threat to the officers and to Evans."  Id. at 18.

There is no hint of discrimination in the officers' reasonable and proportional response.  The majority goes out of its way to emphasize as much.  It writes that "it certainly appears that the officers sought to seize Hunt not because of his mental illness but because of his 'objectively verifiable misconduct' towards the officers and Evans," and it further concludes that "[t]here is no indication that the officers' actions towards Hunt were tainted by any race-based motivations, nor any evidence that Hunt was treated differently from similarly-situated white suspects."  Id. at 26.  Based upon the majority's description of the crisis, the majority writes with some understatement when it says "it does not appear likely from the existing record that discrimination was the motivating factor behind the officers' actions."  Id. at 27.

Indeed, it is not clear even to the majority precisely what discrimination the plaintiff claims.  With respect to disability,

32

the majority writes that "[t]he precise nature of the discrimination claim is not clear to us," id. at 25, and with respect to race, the majority notes that "[p]laintiff's counsel was unable to articulate any particular basis for this claim at argument," id. at 26-27. Despite this, the majority remands "for further proceedings." Id. at 3. Thankfully, the majority's remand is narrow, calling upon the district court to engage in "further delineation," id. at 26, and "further evaluation," id. at 27, but not mandating discovery, id. at 26-28.

Statutory protections may of course exceed constitutional ones and "an adverse determination on the Fourth Amendment claim is not necessarily determinative of the discrimination claims." Id. at 24. This does not mean, however, that statutory and constitutional protections must be placed so squarely and affirmatively at odds. The qualified immunity balance between vindicating meritorious claims and protecting officials from the burdens of litigation is upset when plaintiffs may demand discovery into the motivations of officials whose conduct was outwardly blameless. Harlow v. Fitzgerald, 457 U.S. 800, 815-18 (1982). "[T]here is often no clear end to the relevant evidence" in such inquiries, making them "peculiarly disruptive of effective government." Id. at 817.

Such considerations affect the availability of discovery, as the Supreme Court has held that "a credible showing of different treatment of similarly situated persons" is required before plaintiffs may put officials to the labor and expense of discovery concerning equal protection claims of selective prosecution. United States v. Armstrong, 517 U.S. 456, 470 (1996); see also Marshall v. Columbia Lea Reg'l Hospital, 345 F.3d 1157, 1167 (10th Cir. 2003) (applying Armstrong limits to equal protection claims concerning traffic stops and arrests); United States v. Barlow, 310 F.3d 1007, 1010 (7th Cir. 2002) (applying Armstrong limits to claim that defendant was singled out for law enforcement interview). To proceed with motivational inquiries under disability statutes and the Equal Protection Clause where a neutral basis for action is so exceptionally clear is to set the protections of immunity and the plain teaching of Armstrong at naught.

While the majority describes a remand as the "more prudent" course, Maj. Op. at 26, prudence counsels against perpetuating any further litigation based upon the encounter that the majority describes. There is ample basis to affirm on a record showing that Danville's officers sought to protect in non-excessive fashion an innocent woman they reasonably believed to be a hostage, while under attack by a man they reasonably believed to

34

be armed and dangerous.  If in a desire to avoid litigation the officers had waited and Evans had been harmed, they would have been faulted all the more through the lens of hindsight. Continuing this lawsuit can only demoralize those who place their lives at risk for others.

I would affirm the judgment.