**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

OLIVIA WALLER, Administrator of
the Estate of Rennie Edward Hunt,
Jr., deceased,

        *Plaintiff-Appellant,*

        v.

CITY OF DANVILLE, VIRGINIA, A
municipal corporation,

        *Defendant-Appellee,*

        and

T. NEAL MORRIS, Chief of Police
of the City of Danville, Virginia,
in both his individual and official
capacities; HUGH WYATT, in his
individual and official capacity as
City of Danville Police Officer;
GERALD FORD, in his individual
and official capacity as City of
Danville Police Officer; DENNIS
HALEY, in his individual and
official capacity as City of
Danville Police Officer; JASON
PRESLEY, in his individual and
official capacity as City of
Danville Police Officer;

No. 07-2099

OFFICER GRAHAM, in his individual
and official capacity as City of
Danville Police Officer; JOHN
DOES, Police officers of the City
of Danville Police Department, the
identity and number of whom is
presently unknown; RICHARD ROES,
Supervisory police officers of the
City of Danville, the identity and
number of whom is presently
unknown, in both their individual
and official capacities; TODD
BROWN, in his individual and
official capacity as City of
Danville Police Officer; KENNETH
FITZGERALD; WILLIAM CHANEY; B.
C. ELLIOTT,

*Defendants.*

Appeal from the United States District Court
for the Western District of Virginia, at Danville.
Jackson L. Kiser, Senior District Judge.
(4:03-cv-00039-jlk)

Argued: December 4, 2008

Decided: February 12, 2009

Before WILKINSON, MOTZ, and TRAXLER,
Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Motz and Judge Traxler joined.

## COUNSEL

**ARGUED:** Charles Edelman Borden, O'MELVENY & MYERS, L.L.P., Washington, D.C., for Appellant. Martha White Medley, DANIEL, MEDLEY & KIRBY, P.C., Danville, Virginia, for Appellee. **ON BRIEF:** Lani R. Miller, Amber Taylor, O'MELVENY & MYERS, L.L.P., Washington, D.C., for Appellant. James A. L. Daniel, M. Brent Saunders, H. Clay Gravely, IV, DANIEL, MEDLEY & KIRBY, P.C., Danville, Virginia, for Appellee.

---

## OPINION

WILKINSON, Circuit Judge:

Olivia Waller appeals the district court's grant of summary judgment to defendants on her claim under Title II of the Americans with Disabilities Act ("ADA"). Appellant argues that the Danville Police Department failed to reasonably accommodate Rennie Hunt's mental illness while Hunt held a woman hostage in his apartment, leading to a violent confrontation with police that left Hunt dead. We hold that any duty of reasonable accommodation that existed under the ADA was satisfied in these circumstances. We therefore affirm the judgment.

### I.

### A.

We briefly review the facts in this case, which are set out in our earlier opinion, *Waller v. City of Danville*, 212 F. App'x 162 (4th Cir. 2006).

At 9:23 p.m. on May 10, 2002, the Danville Police Department ("DPD") received a 911 call from Teressa Jennings. Jen-

nings was concerned about her friend, Virginia Evans, and said she had not been able to reach Evans for two days despite calling and knocking on her door. Jennings reported that Evans had a live-in boyfriend, Rennie Hunt, whom Jennings described as a "mental patient" who had been "in and out of the hospital."

In response to the 911 call, three DPD officers met Jennings at Hunt's apartment, where Hunt refused to let them in. Evans called from inside the house that she was "okay" but that Hunt would not let her come to the door. When officers called out to Hunt, he told them "not to be concerned with" Evans and to "leave [him] alone." Officers thought Hunt sounded mentally disturbed. After failing to confirm Evans's safety, they contacted their supervisor, Captain David Stowe, who came to the scene. Hunt refused to let Stowe check on Evans and said, "If you come in here, I've got something for you," leading Stowe to think he had a weapon.

Stowe then returned to police headquarters and conferred with the shift commander. He also ran Hunt's criminal history and found that Hunt had prior arrests for public drunkenness, disorderly conduct, and assault on Evans. Stowe further conferred with his direct superior, Major B.C. Elliott, telling Elliott that Hunt had been in and out of mental institutions. In response, Elliott instructed Stowe to call Lieutenant Hugh C. Wyatt, a DPD hostage negotiator. In the meantime, Evans's sister had arrived at the apartment and told officers she had not heard from Evans in several days and that Hunt had several times been admitted to mental institutions.

When Wyatt arrived at the apartment, almost two hours had elapsed since the original 911 call. When Wyatt spoke to Hunt through the back door, Hunt yelled, "I'm going to blow your goddamned head off." This threat led Wyatt to cease negotiations, and officers decided to seek an arrest warrant against Hunt for assault. DPD then deployed its Emergency Response Team ("ERT"), which eventually forced its way

into the apartment through the back door. After Hunt came toward the officers twice, swinging what appeared to be a scythe and brandishing what looked like a knife, three officers shot and killed him.

B.

In April 2003, Hunt's sister, Olivia Waller ("plaintiff-appellant"), personally and as administrator of Hunt's estate, brought an action under 42 U.S.C. § 1983 against the City of Danville, DPD, and individual officers ("defendants"). The complaint alleged *inter alia* that defendants had violated the Fourth and Fourteenth Amendments to the U.S. Constitution as well as the Americans with Disabilities Act and the Rehabilitation Act. Specifically, Count IV of the complaint alleged that the City of Danville had discriminated against Hunt on the basis of his disability by unlawfully arresting him, using excessive force, and failing to properly train officers in dealing with the disabled.

The district court granted officers qualified immunity on plaintiff's Fourth Amendment claims. In December 2005, the district court granted summary judgment to defendants on all of plaintiff's claims and dismissed as moot plaintiff's request for further discovery. Plaintiff appealed the grant of summary judgment to this court.

This court affirmed the district court's ruling on plaintiff's Fourth Amendment claim, holding that "the use of deadly force by [officers] was objectively reasonable . . . in light of the facts and circumstances presented to [them] at the time." *Waller*, 212 F. App'x at 171. We noted that Hunt and Evans had been secluded for several days, that police had recently arrested Hunt for domestic assault on Evans, and that Hunt had implied to officers "that he had a weapon and was prepared to use it." *Id.* at 170.

We reversed and remanded the grant of summary judgment, however, on appellant's claims of disability and race discrimination.[1] We concluded that "it certainly appears that the officers sought to seize Hunt not because of his mental illness but because of his 'objectively verifiable misconduct' towards the officers and Evans." *Id.* at 173. But we found that the "precise nature of the discrimination claim" was unclear, that the parties had not fully briefed the merits of the claim, and that appellant had not been able to conduct discovery on the claim. *Id.* We therefore remanded "for further delineation of the discrimination claims by the plaintiff, inquiry by the district court and, if necessary, discovery into the claims as articulated by plaintiff." *Id.* at 173-74.

On remand, the parties conducted extensive discovery on the ADA claim. The district court then granted summary judgment to defendants, holding that exigent circumstances present throughout the investigation absolved DPD of any duty to reasonably accommodate Hunt's mental illness. *Waller v. City of Danville*, 515 F. Supp. 2d 659, 664 (W.D. Va. 2007). The court noted that Evans had been missing for days, that Hunt would not let the officers see her, and that Hunt used threatening language toward the officers. *Id.* The court concluded that requiring officers to concern themselves with ADA compliance in such circumstances would unnecessarily endanger innocent lives. *Id.* (citing *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000)). Regarding the failure to train claim, the court concluded that the ADA's plain language does not support a claim for failure to train. *Id.* at 665. Plaintiff now appeals. We review a grant of summary judgment *de novo*, viewing the facts in the light most favorable to plaintiff, the non-prevailing party.

---

[1]The parties later stipulated to dismissal of the race discrimination claim with prejudice.

## II.

### A.

Plaintiff's chief claim in the instant appeal is that DPD violated the ADA by failing to reasonably accommodate Hunt in the two hour standoff prior to Hunt's threat against Wyatt. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Discrimination" under the statute includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . ." *Id.* § 12112(b)(5)(A). The district court held that no duty of reasonable accommodation arose under these circumstances and plaintiff contends vigorously not only that such a duty existed but that it was breached in this case.

In the context of arrests, courts have recognized two types of Title II claims: (1) wrongful arrest, where police arrest a suspect based on his disability, not for any criminal activity; and (2) reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees. *See Gohier v. Enright*, 186 F.3d 1216, 1220-21 (10th Cir. 1999); *see also Gorman v. Bartch*, 152 F.3d 907, 912-13 (8th Cir. 1998) (holding that a paraplegic arrestee could make out a reasonable accommodation claim under the ADA after being injured in a police van not equipped with wheelchair restraints).

Some courts, however, including the district court here, have held that Title II contains an "exigent circumstances" exception that absolves public entities of their duty to provide any reasonable accommodation. *See Waller*, 515 F. Supp. 2d at 663-64; *see also Hainze v. Richards*, 207 F.3d 795 (5th Cir.

2000). In *Hainze*, the Fifth Circuit held that "Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." 207 F.3d at 801. Requiring officers to consider ADA compliance in such situations would risk public safety; in *Hainze*, for example, the suspect came toward police across a parking lot, brandishing a knife and refusing orders to halt. *Id.* at 797, 801. Therefore, officers had no duty to accommodate his mental illness before securing the scene and ensuring public safety. *Id.* at 801.

The DPD relies on *Hainze* to argue that the ADA's duty of reasonable accommodation did not apply during the standoff at Hunt's apartment. Whether or when an "exigent circumstances" constraint upon the ADA exists, however, is a broader proposition than is needed to decide this case. For it is clear that exigency is not irrelevant. Reasonableness in law is generally assessed in light of the totality of the circumstances, and exigency is one circumstance that bears materially on the inquiry into reasonableness under the ADA. Accommodations that might be expected when time is of no matter become unreasonable to expect when time is of the essence.

In this case, plaintiff argues that officers were not working in a compressed timeframe because they had two hours to assess the state of affairs in Hunt's apartment. But "exigency" is not confined to split-second circumstances. Although the officers did not face an immediate crisis, *cf. Hainze*, 207 F.3d at 801-02, the situation was nonetheless unstable: the officers could not see or speak to Evans, Hunt implied that he had weapons, and Hunt was growing more and more agitated. The standoff could have taken a dark turn quickly and led to the loss of Evans's life. If officers were not actually making split-second decisions, they were nonetheless operating under the pressure of time from the start. Just as the constraints of time

figure in what is required of police under the Fourth Amendment, they bear on what is reasonable under the ADA. *See Bates v. Chesterfield County*, 216 F.3d 367, 372 (4th Cir. 2000) ("[T]he volatile nature of a situation may make a pause for psychiatric diagnosis impractical and even dangerous."). A reasonable belief on the part of officers "that this was a potentially violent hostage situation" may not resolve the ADA inquiry, but it cannot help but inform it. *Waller*, 515 F. Supp. 2d at 664.

## B.

Plaintiff suggests several possible courses of action that she argues would have constituted "reasonable accommodation" under the ADA during the standoff. First, she criticizes officers for banging on Hunt's door and yelling, noting that these actions could have further agitated Hunt. She also argues that officers could have called mental health professionals, contacted Hunt's family members, or sought to administer medications to Hunt. Plaintiff maintains that these actions could well have led to a more benign outcome.

We shall assume for purposes of argument that a duty of reasonable accommodation existed. *See* § 12112(b)(5)(A). Given the circumstances presented to the officers, however, we conclude that it was unreasonable to expect the sorts of accommodations that plaintiff proposes. To say that officers should have taken certain other actions during the standoff is to lean far in the direction of impermissible hindsight. *See Hainze*, 207 F.3d at 801-02. And plaintiff's list of potential responses — summoning mental health professionals and family members and administering medication — is itself problematic.

First, it would be unclear to officers which of plaintiff's various alternatives they would be required to pursue. Officers would be second-guessed for pursuing one over the other, on grounds that there was always something more or different

that could have been done. Moreover, the delay involved in getting the proper professionals or medications or determining which family member to call, for instance, might itself be considerable. *See, e.g.*, *Bates*, 216 F.3d at 372. As to mental health professionals, it is unclear even now which or how many professionals should have been called or what the officers were required to permit them to do once they arrived. Officers were likewise in no position to know what sort of relationships existed within Hunt's family, and if they had called to the scene a family member from whom Hunt was alienated or estranged, they could have escalated the situation rather than defusing it. As for medications, there is no indication that Hunt would have taken medicines the police or anyone else provided. Officers in particular are not trained as medical doctors, and nothing in the record suggests that they knew which medications Hunt should take, whether he had recently taken medications, or what dosage would be appropriate, or that they could have easily obtained the relevant medical information while monitoring Evans's safety as well as their own. Given the circumstances of the standoff, we believe the sorts of suggestions proposed by plaintiff go beyond what is meant by "reasonable accommodation." *See Hainze*, 207 F.3d at 801-02.

There is also the danger in third party hostage situations that an excessive focus on avoiding civil liability could skew the officers' assessments. Officers were balancing two aims here, not one: they wanted to defuse the situation and help Hunt regain a sense of composure, but they also hoped to save Evans from serious harm. In this regard, a hostage situation is unlike that of most ADA claims, where employers or public entities are accommodating individuals with whom they have a history of association or at least with whom they can communicate. *See* 42 U.S.C. § 12131. But Hunt was behind closed doors and barely speaking. The notion that officers should have done more to accommodate him overlooks the impediments involved.

Instead, any duty of reasonable accommodation that might have existed was satisfied in several ways. First, officers spoke with their supervisors and with persons close to the situation: Jennings, who placed the 911 call, and Evans's sister. Both confirmed that Hunt had a history of mental illness. Officers also called in a DPD hostage negotiator, Lieutenant Wyatt. Wyatt's qualifications were not in dispute: he had served with DPD since 1965, working as a hostage negotiator and as head of the ERT.[2] He also prepared DPD's procedures for hostage negotiations and had trained other officers on proper methods for negotiating with hostage-takers.

At deposition, Wyatt testified that he repeatedly requested that Hunt let him see Evans to confirm her safety, but Hunt kept Evans away from the door and yelled at Wyatt to "get away." Further, Wyatt testified that the late hour of the stand-off would have made it difficult to reach mental health professionals at the hospital, even if time had allowed for such consultation. Nothing in the record suggests that Wyatt acted toward Hunt in a manner that escalated tensions; rather, Wyatt considered all plausible options, attempted to speak with Hunt, and tried to verify Evans's safety.

Second, it bears notice that police attempted to calm the situation by waiting at least two hours before entering the apartment. Several officers attempted to speak with Hunt through the apartment door, and, as plaintiff notes, officers made at least nine phone calls during the standoff: they summoned supervisors, spoke further with Jennings, contacted Evans's sister, and ran a criminal background check on Hunt. All of these actions reflect the officers' considered judgment that a period of waiting might calm Hunt and bring a peaceful reso-

---

[2]Following oral argument, plaintiff submitted a motion to supplement the record with portions of Wyatt's deposition. Plaintiff argues that this testimony raises doubts about the extent of Wyatt's disability training. We note that even if it were proper to supplement the record, the additional information would make no difference to our decision.

lution to the standoff. To be sure, as Hunt grew more agitated, officers decided that waiting further posed unacceptable risks, most especially to Evans. But the decision to wait was a sound exercise of discretionary judgment that bears on the reasonableness of any accommodation required.

We note that "reasonable accommodation" in this case bears a resemblance to how police might have addressed a hostage situation that did not involve a disabled individual. In any potentially violent standoff, the officers may have summoned a hostage negotiator and may have waited several hours before entering the apartment. Having now had the benefit of further discovery and argument, we think plaintiff has not indicated what the officers reasonably might be expected to do that they in fact did not do. The loss of any life is a tragedy, never to be discounted. But we cannot see that this injury, unfortunate as it was, flowed from any violation of the ADA.[3]

*AFFIRMED*

---

[3]Because we conclude that any duty of reasonable accommodation was met in these circumstances, we do not reach the question of whether the ADA supports a claim for failure to train. While plaintiff attempts to pose training in dealing with those with mental health problems as an "accommodation," it is well-settled that the failure to train must have caused some violation of law for an action against a municipality to lie. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Bates*, 216 F.3d at 373 n.3.