MARBLEY, District Judge,
concurring in part and concurring in the judgment.
I concur in the court’s holding that the officer’s use of deadly force in this case, where Krause fired first, did not violate Krause’s Fourth Amendment rights. An officer in the position of Officer Jones, who had heard Krause’s threats, knew that he was armed, and saw the muzzle flash of Krause’s gun, reasonably could determine that Krause posed a serious threat to him and to other officers, and that the threat must be neutralized.
I write separately, however, to express my disagreement with the court’s conclusion that it was reasonable for Officer Jones to shoot Krause twenty times. See R. 17-6 at 4-14. The majority flatly announces that the number of rounds fired by Jones “flow[ed] from the reasonable decision” of the officer to engage the automatic-fire function of his weapon. Supra at 681; I find such a decision to be neither reasonable nor inevitable. The majority notes that, if an officer is justified in firing, he may continue to fire until the threat has ended. See Plumhoff v. Rickard, — U.S. —, 134 S.Ct. 2012, 2022, 188 L.Ed.2d 1056 (2014). But this analysis ignores any consideration of the decisions — and the reasonableness thereof — made by police in the run-up to their entrance. Indeed, the majority has no trouble concluding that, after waiting ten hours for Krause to exit his house, waiting a minute longer was unnecessary. True, the majority concedes, “the plan did not end well.” Supra at 681. But the majority appears to sanction the officers’ conduct in arriving with blood and thunder, detonating a flash bang despite the fact that Krause was sleeping, and pre-engaging the automatic-fire modes on their weapons, thereby ensuring that a single trigger pull would result in a fusillade.
Claims against officers for use of excessive force during a stop or arrest are properly analyzed in keeping with “the Fourth Amendment’s prohibition against unreasonable seizures of the person,” wherein the “reasonableness” of a particular seizure “depends not only on when it is made, but also on how it is carried out.” Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (emphasis in original). This determination re *683 quires “a careful balancing of ‘the nature and quality of the intrusion on the individual’s Fourth Amendment interests’ against the countervailing governmental interests at stake.” Id. at 396,109 S.Ct. 1865 (quoting Tennessee v. Garner, 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). Of course, the “reasonableness” inquiry must be judged objectively, from the perspective of a reasonable officer at the scene, not based on hindsight, and must allow for “the fact that police officers are often forced to make split-second judgments.” Id. at 397, 109 S.Ct. 1865.
But I struggle to understand why the majority’s analysis is bereft of any examination into the officers decisions not to wait longer, or to leave Krause asleep while apprehending him, or at minimum to shoot merely in order to incapacitate, rather than to destroy. Compare Baker v. City of Hamilton, Ohio, 471 F.3d 601, 607 (6th Cir.2006) (“We have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.”). The case sub judice is unlike Plumhoff, where a fleeing, reckless motorist “never abandoned his attempt to flee” during the 10-second span when police shot him 15 times. 134 S.Ct. at 2022. Here, Krause — who was admittedly armed with a gun and seemingly eager to die — started awake, fired once, and died in a hail of 20 bullets.
Once Krause fired, it is clear that the officer’s decision to return fire was reasonable. But surely this court is able to question also the pre-shooting conduct by law enforcement. See, e.g., Claybrook v. Birchwell, 274 F.3d 1098, 1105 (6th Cir.2001) (considering earlier shooting in assessing the reasonableness of officer’s ultimate use of fatal force); see also Terebesi v. Torreso, No. 12-3867, 764 F.3d 217, 234, 2014 WL 4099309, at *11-12 (2d Cir. Aug. 21, 2014) (“Our case law thus clearly establishes that planners may be liable under section 1983 to the extent that a plan for a search or seizure, as formulated and approved by those defendants, provides for and results in an unconstitutionally excessive use of force.”); Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 22 (1st Cir.2005) (“[0]nce it is clear that a seizure has occurred, the court should examine the actions of the government officials leading up to the seizure.”) (quotation omitted); Abraham v. Raso, 183 F.3d 279, 291-92 (3d Cir.1999) (disagreeing with “those courts which have held that analysis of ‘reasonableness’ under the Fourth Amendment requires excluding any evidence of events preceding the actual ‘seizure.’ ”); Billington v. Smith, 292 F.3d 1177, 1188 (9th Cir.2002) (Police “could be held liable for shooting the [suspect] — even though they reasonably shot him at the moment of the shooting — because they used excessive force in creating the situation which caused [the man] to take the actions he did.”) (quotation omitted); Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1189 (10th Cir.2001) (The “totality of the circumstances surrounding a seizure embraces conduct immediately connected with the seizure, such as police conduct arguably creating the need for force where use of excessive force has been alleged.”) (quotations omitted); Bella v. Chamberlain, 24 F.3d 1251, 1256 (10th Cir.1994) (“Obviously, events immediately connected with the actual seizure are taken into account in determining whether the seizure is reasonable.”); but see Waller v. City of Danville, 212 Fed.Appx. 162, 171 (4th Cir.2006) (“Although circuits differ on the question of how pre-shooting conduct should be weighed in an excessive force ease, this circuit has repeatedly held that such conduct is generally not relevant and is inadmissible.”).
If officers had decided, for example, to carry with them a grenade launcher, or *684 call down a strike from a Predator drone, or take other actions which recklessly created excessive risk, this court would be justified in asking whether officers acted unreasonably in their preparations. Compare Bing ex rel. Bing v. City of Whitehall, Ohio, 456 F.3d 555, 570 (6th Cir.2006) (Even “if the police had a great enough interest to use deadly force against [defendant], it does not follow that they may do so in any way they desire, say, by burning down his house rather than shooting at him.”). It is equally appropriate that we inquire why officers were justified in entering with their weapons set to fully-automatic fire. I cannot accept the blind conclusion that this action was reasonable.
What is more, it is deeply troubling to see that, before launching their raid against the sleeping Krause, police considered other options, including the truly outrageous possibility of “using the SWAT team’s tank to bring down the exterior wall of the bedroom and to seize Krause in that way.” Supra at 678. This deliberation is disturbing not for the fact that police opted for a different choice, but because such a shockingly militarized option was even a consideration in the apprehension of a low-level drug dealer. In comparison, the officers’ choice merely to use fully-automatic rifles, riot shields, and flash-bang grenades seems almost reserved. But it is precisely this sort of jurisprudential creep which must be resisted at all costs; indeed, as the Supreme Court long ago warned, “[i]t is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be obsta principiis [‘resist the beginnings’].” Boyd v. United States, 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746 (1886).[1]
The doctrine of qualified immunity serves the importance purpose of “protect[ing] the State and its officials from overenforcement of federal rights,” Johnson v. Fankell, 520 U.S. 911, 919, 117 S.Ct. 1800, 138 L.Ed.2d 108 (1997), allowing “officials [to] act without fear of harassing litigation,” Davis v. Scherer, 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). But we must not lose sight of the fact that, “[w]here an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to-hesitate.” Harlow v. Fitzgerald, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (emphasis supplied). This court cannot condemn the actions of officers “from the peace and safety of [our] chambers with the 20/20 vision of hindsight.” Supra at 681 (quotation omitted). But it is equally incumbent on us, in discharging our duty to “say what the law is,” that we craft a jurisprudence that will empower officers to eliminate a threat while still encouraging them to preserve life. See Garner, 471 U.S. at 10-11, 105 S.Ct. 1694 (“The use of deadly force is a self-defeating way of apprehending a suspect”; “[i]t is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to oth *685 ers, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.”).
There was no need for Matthew Krause to die. Despite his threats that he might “come out shooting,” as officers prepared to enter his bedroom he was asleep, posing a danger to no one. In facing such a suspect, police must do more than merely select from an array of deadly options that threaten an unreasonable risk of death — at least when safer, simpler options remain. It is not our duty to second-guess law enforcement. But is emphatically our duty to ensure that the law reflects our society’s commitment to saving lives, not meaninglessly taking them.
For these reasons, I respectfully concur in part and concur in the judgment.

. Police action that today is borderline — but ultimately immunized' — -will tomorrow be “clearly established” and shielded beyond dispute. As one commentator has recognized in a related context, "[a] 'steady drumbeat' of [Fourth Amendment] violations that will not be subject to [the exclusionary rule] will become more and more accepted — not as technical violations — -but as accepted behavior.... [Wjhat will be considered egregious enough to justify exclusion will also be influenced, resulting in increasingly diminished respect for the right to be secure over time.” Thomas K. Clancy, The Fourth Amendment’s Exclusionary Rule as a Constitutional Right, 10 Ohio St. J.Crim. L. 357, 383 (2013) (footnote omitted).