MAY, J.
In this age of increased awareness of mental health issues, there is still so much to be done to ensure the safety of the public as well as those suffering from mental illness. This case illustrates why. The plaintiff appeals a summary judgment in favor of the Sheriff and a deputy, which resulted from the shooting death of the plaintiffs wife during the execution of a Baker Act certificate.[1] For the reasons that follow, we affirm.
The tragic death of the plaintiffs wife resulted when deputies from the Palm Beach County Sheriffs Office attempted to take the plaintiffs wife into custody on a Baker Act certificate for transportation to a mental health facility for observation and treatment. The complaint consisted of *1272 four counts against the Sheriff, and three counts against the individual deputy involved in the shooting. The four counts against the Sheriff included a wrongful death claim brought under 42 U.S.C. § 1983, survivorship damages under § 1983, a wrongful death claim under Florida law, and a claim under the Americans with Disabilities Act (ADA). The counts against the deputy included the wrongful death and survivorship claims under 42 U.S.C. § 1983, and the wrongful death claim under state law.
The facts are undisputed. The decedent’s husband contacted the Sheriffs Office to transport his wife to a mental health facility, pursuant to a Baker Act certificate. The certificate indicated that the decedent was in a “persistent severe delusional and agitated state,” had a “long history of severe depression,” and had been “walking around the house with knives....” She had “essentially included everyone in her delusional system, including her husband and [the psychiatrist]” and was “probably holding knives at the moment.” “There [was] a substantial likelihood that without care or treatment [she] w[ould] cause serious bodily harm to [her]self and others.” The Baker Act Certificate was signed at 9:00 a.m. on March 27, 2006.
Around 10:00 a.m. on March 27, 2006, a deputy was dispatched to the scene. The deputy requested back-up before he arrived, and a third deputy was requested at the scene. The husband was standing outside the home when the deputies arrived. He indicated that he wanted the deputies to take the decedent to a mental health facility. He informed them that the decedent was in the home, had tried to commit suicide a few days earlier, kept knives at her side for protection, and was suffering from delusional paranoia.
The three deputies decided that the lead deputy would go in front with his service weapon un-holstered; the back-up deputy would follow with his Taser drawn; and the third deputy would enter last with his service weapon un-holstered. Before searching the home, the lead deputy called for the decedent. Receiving no response, the deputies searched the home.
After searching the home and securing all areas, except the master bedroom and bathroom, the lead deputy heard a door close; the back-up deputy smelled cigarette smoke coming from the master bedroom. Before the deputies approached the bedroom, they announced the Sheriffs Office was present. The lead deputy called the decedent again and indicated that he wanted to speak with her.
The deputies searched and secured the master bedroom and then entered the bathroom. The lead deputy did not know if she was hurting anyone, cutting herself, or trying to kill herself. When he entered the bathroom, he announced their presence, indicated that they were there to help her, and told her to come out of the bathroom. The decedent rose from behind a door near the commode and came at the lead deputy with a knife raised over her head. The back-up deputy used his Taser, but there was no evidence that it struck her. The decedent continued to move toward the lead deputy. The lead deputy fired his service weapon. The bullet struck her in the chest, causing her to fall with the knife remaining in her hand. The lead deputy reported the shooting and tried to perform CPR on the decedent until the paramedics arrived. The decedent was later pronounced dead.
The former husband filed a complaint against the lead deputy individually and the Sheriff in his official capacity, alleging section 1983 wrongful death claims, surviv-orship damages, a Florida wrongful death claim, and a claim under the ADA against the Sheriff alone. The parties stipulated *1273 that the lead deputy was acting under color of state law and that the decedent had a mental disability within the meaning and purview of Title II of the ADA.
Following extensive discovery, the Sheriff and deputy filed a joint motion for summary judgment. They attached extensive appendices, containing deposition transcripts, sworn statements, and affidavits. In an affidavit, a Captain of the Sheriffs Office opined that the Sheriff does not tolerate any deviation from his policies on the use of deadly and non-deadly force, and “otherwise does not authorize or permit deputy sheriffs to use excessive deadly force or excessive non-deadly force.” Another Captain explained that deputies must attend and complete training courses in the use of force at least once per year.
The Sheriffs Office provides specialized classes each year to address the circumstances presented by the mentally ill, and to provide needed tools to handle encounters with them. These classes are part of the Palm Beach County Crisis Intervention Team Program (CIT). The CIT addresses suicide prevention, dealing with suicidal persons and persons who pose a threat to themselves or others, communicating with the mentally ill, and techniques for calming mentally ill persons. Although participation is voluntary, more than 200 deputies in the Sheriffs Office have been trained as CIT officers, including the lead deputy in this case.
In opposition to the motion for summary judgment, the husband filed an expert affidavit of a retired police chief. The expert opined that the Sheriff was deliberately indifferent to, and exhibited reckless disregard for, the safety of the decedent and other mentally ill persons. He based his opinion on the Sheriffs failure to recall efforts to implement the CIT in Palm Beach County, what training his deputies received concerning the mentally ill, and the lack of a dispatch protocol. The expert further opined that the ADA requires agencies to review their services, policies, and practices for compliance with the ADA, and the Sheriffs Office did not have a policy or protocol for encounters with the mentally ill.[2]
The expert further opined that the three deputies “violated every recommended procedure recognized and accepted in the law enforcement profession for dealing with the mentally ill....”[3] The lead deputy violated recognized protocols by not allowing the husband into the home, failing to learn the layout of the home, opening the bathroom door before talking to the decedent, and taking only a couple of minutes from the time of entry to the shooting. In his opinion, no reasonable officer would have created the face-to-face encounter with the decedent, and should have tried to calm the situation to avoid the use of deadly force.
The trial court granted the joint motions and entered a final judgment, from which the plaintiff now appeals.
The standard of review on orders granting summary judgment is de novo. Cohen *1274 v. Arvin, 878 So.2d 403, 405 (Fla. 4th DCA 2004). Summary judgment should be granted “only where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.” Id.
The plaintiff argues that genuine issues of material fact remain between the expert’s affidavit and the defendants’ testimony and affidavit. In particular, the plaintiff argues that the totality of the circumstances must be viewed and not just what transpired when the deputies entered the bathroom. We agree that the totality of circumstances should be reviewed, but considering the totality of the circumstances, we find no error in the trial court’s entry of summary judgment.

Section 1983 Claims Against the Sheriff and the Deputy

Four counts of the complaint alleged violations of section 1983. Two counts alleged excessive force resulting in wrongful death against the Sheriff and the lead deputy, and two counts alleged the same excessive force resulting in the husband’s survivorship claims against each.
“To state a claim under 42 U.S.C. § 1983, ‘a plaintiff must allege the violation of a right secured by the Constitution and the laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.’ ” Abraham v. Raso, 183 F.3d 279, 287 (3d. Cir.1999) (quoting West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). In establishing a constitutional violation by alleging a claim of excessive force, a plaintiff must show that a seizure occurred and it was unreasonable. Id.
“[AJpprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.” Tennessee v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). “[T]he ‘reasonableness’ inquiry in an excessive force case is an objective one: the question is whether the officers’ actions are ‘objectively reasonable’ in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.” Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). “[R]easonableness depends on not only when a seizure is made, but also how it is carried out.” Garner, 471 U.S. at 7, 105 S.Ct. 1694.
 “Qualified immunity shields government officials from liability for civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right.” Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir.2008). The officer has the initial burden of demonstrating that he was acting within his discretionary authority. McGory v. Metcalf, 665 So.2d 254, 258-59 (Fla. 2d DCA 1995). If the initial burden is met, the burden shifts to the plaintiff to show the lack of good faith on the deputy’s part by demonstrating his conduct violated clearly established law. Id. at 259.
Justice Kennedy explained the role of qualified immunity in Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), abrogated on other grounds by Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009):
In a suit against an officer for an alleged violation of a constitutional right, the requisites of a qualified immunity defense must be considered in proper sequence. Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Qualified immunity is “an entitlement not to stand trial or face the other burdens of litigation.” The privi *1275 lege is “an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.” As a result, “we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.”
Id. at 200-01, 129 S.Ct. 808 (emphasis in original) (citation omitted).
The question to be answered is: “Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer’s conduct violated a constitutional right?” Id. at 201, 129 S.Ct. 808. The inquiry must be taken “in light of the specific context of the case....” Id.
Here, the defense of qualified immunity shields the lead deputy. Cases on excessive force vary on whether similar actions are objectively reasonable and whether that decision belongs to a jury. Compare Abraham v. Raso, 183 F.3d 279 (3d Cir.1999), with Kesinger v. Herrington, 381 F.3d 1243 (11th Cir.2004). What is clear is that the court must review the totality of the circumstances in determining whether the deputy’s actions were objectively reasonable, and the plaintiff bears the burden of establishing a lack of good faith.
Looking at the totality of circumstances, the decedent posed a threat to herself and to the deputies because the undisputed facts established that the decedent was suicidal, had armed herself with knives, and was suffering from delusional paranoia. Also undisputed is that the decedent lunged at the deputies with a knife raised over her head. Imminent danger was present, and there was no showing that the lead deputy lacked good faith in his actions. See Kesinger, 381 F.3d at 1249-50 (remanding the case for entry of a summary judgment in favor of an officer who shot a man based upon qualified immunity); McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1246 (11th Cir.2003) (“[T]he Constitution permits the use of deadly force ... against a suspect who poses ... an imminent threat of danger to a police officer or others.”). See also Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (“Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others,” it is not unreasonable to use deadly force.); and McGory v. Metcalf, 665 So.2d 254 (Fla. 2d DCA 1995) (finding that the officer’s motion for summary judgment should have been granted where the officer had probable cause to believe that victim posed an imminent threat of harm to him when victim pointed a gun at officer).
For this same reasoning, the trial court correctly entered summary judgment for the Sheriff on the section 1983 wrongful death claim. As the deputy committed no constitutional violation, the claim against the Sheriff must fail. See Garczynski v. Bradshaw, 573 F.3d 1158, 1171 (11th Cir.2009) (“Absent a constitutional violation, we need not explore whether PBSO’s policies regarding crisis intervention training violated Garczynski’s constitutional rights.”).
Further, “there are limited circumstances in which an allegation of a ‘failure to train’ can be the basis for liability under [section] 1983.” City of Canton, Ohio v. Harris, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). “[T]he inadequacy of police training may serve as the basis for [section] 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.” Id. at 388, 109 S.Ct. 1197 (emphasis added). To establish deliberate indifference, the “plaintiff must present some evidence that the municipality knew of a need *1276 to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.” Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir.1998).
Without notice of a need to train, a municipality is not liable as a matter of law. Id. at 1351. A “ ‘single incident’ of misconduct, without other evidence, cannot provide the basis for municipal liability under [section] 1983” because “[s]uch a result would be the equivalent of imposing respondeat superior liability upon the municipality.” Bordanaro v. McLeod, 871 F.2d 1151, 1161 n. 8 (1st Cir.1989) (emphasis in original).[4]
The Sheriff presented evidence that crisis intervention training was available to the deputies on a voluntary basis and this deputy had taken the training. While tragic, this was an isolated incident. There was no showing of multiple incidents that would place the Sheriff on notice of a need for more training. Without proving deliberate indifference, the section 1983 claim against the Sheriff cannot be sustained.

Florida Wrongful Death Act Claims 
[5]

The plaintiff next argues the trial court erred in entering summary judgment on the state wrongful death claim against the Sheriff. He argues that section 30.07, Florida Statutes (2006) imposes liability against the Sheriff for the “acts and neglect” of his deputies and for failing to adopt policies and training procedures for police interactions with persons with mental illness. Without articulating that this section of the initial brief refers to the state law wrongful death claim against the Sheriff, it appears that the plaintiff relies on the “number of PBSO deputy encounters with mentally ill people” to demonstrate “a need to develop strategies, policies, procedures and practices that would allow such encounters to end benignly, for all parties, in the appropriate seizure and transportation to mental health facilities.”
Section 30.07 provides: “Sheriffs may appoint deputies to act under them who shall have the same power as the sheriff appointing them, and for the neglect and default of whom in the execution of their office the sheriff shall be responsible.” § 30.07, Fla. Stat. (2006). While this statute can serve as a basis for liability, section 768.28, Florida Statutes (2006), and the immunity it provides must be overcome.
Subsection 768.28(9)(a) specifically provides that “[n]o officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, em *1277 ployee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.” § 768.28(9), Fla. Stat. (2006).
 “Importantly, the immunity provided by section 768.28(9)(a) is both an immunity from liability and an immunity from suit, and the benefit of this immunity is effectively lost if the person entitled to assert it is required to go to trial.” Willingham v. City of Orlando, 929 So.2d 43, 48 (Fla. 5th DCA 2006) (emphasis in original). Just as Justice Kennedy discussed qualified immunity with regard to section 1983 claims in Saucier, qualified immunity in a state claim is also an issue the trial court should address as soon as possible because the trial court “must act as a gatekeeper ... and should terminate civil proceedings when the immunity applies.” Id.
In fulfilling this obligation, “the trial judge should ask whether a reasonable trier of fact could possibly conclude that the conduct was willful and wanton, or would otherwise fall within the exceptions to the statute.” Id. Here, there was no evidence of bad faith, malicious purpose, or a wanton and willful disregard of human rights or safety. The trial court correctly granted summary judgment on this claim.

The ADA Claim Against the Sheriff

The plaintiff next argues that summary judgment on the ADA claim was error because the Sheriff’s Office “lacked policies and procedures required by the ADA, to provide reasonable accommodations, in non-exigent circumstances, for [the decedent’s] disability.” See 42 U.S.C. §§ 12112,12134 (2006).
Title II of the ADA provides that “no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.” § 12112. Discrimination includes “not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ....”§ 12112(b)(5)(A). Significantly, however, exigent circumstances absolve public entities of their duty to provide reasonable accommodations. Waller v. City of Danville, Va., 556 F.3d 171, 174-75 (4th Cir.2009); Hainze v. Richards, 207 F.3d 795, 801 (5th Cir.2000).
In Waller, a mentally disabled man held a woman hostage in his apartment, leading the man to be fatally shot by police officers. 556 F.3d at 172-73. When the police tried speaking to the man through a back door, the man used threatening language. Id. at 173. The threat led the police to cease negotiations and force their way into the apartment. Id. After the man “came toward the officers twice, swinging what appeared to be a scythe and brandishing what looked like a knife, three officers shot and killed him.” Id. An ADA claim was filed against the police. Id. The Fourth Circuit held that the officers did not fail to comply with any duty to reasonably accommodate the man.
“[E]xigency” is not confined to split-second circumstances. Although the officers did not face an immediate crisis, the situation was nonetheless unstable: the officers could not see or speak to [the hostage], [the suspect] implied that he had weapons, and [ ] was growing more and more agitated. The standoff could have taken a dark turn quickly and led to the loss of [ ] life. If officers were not actually making split-second decisions, they were nonetheless operating under the pressure of time from the start. Just as the constraints of time figure in what is required of police under the *1278 Fourth Amendment, they bear on what is reasonable under the ADA.
Id. at 175 (citation omitted).
In Hainze, a woman requested that police transport her suicidal nephew to a mental facility. 207 F.3d at 797. The officer observed the nephew outside a convenience store where he was standing next to an occupied truck with a knife in his hand. Id. The deputy exited his vehicle and ordered the nephew away from the truck. Id. When the nephew was within four to six feet, the deputy fired two shots into his chest. Id.
The nephew sought relief under Title II of the ADA for the Sheriffs Office’s failure to train its deputies to protect mentally ill individuals. Id. at 798. The nephew argued the deputy failed to calm him, give him space by backing away, or attempt to defuse the situation. Id. at 800-01. In holding that the deputy’s use of excessive force was not actionable under the ADA, the Fifth Circuit explained:
Law enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations. To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents.
Id. 801.
Here, similar to Waller and Hainze, exigent circumstances existed. The decedent was suicidal, delusional, and known to possess knives. The officers prepared for their encounter by having one deputy ready with a Taser and the other deputies with unholstered guns. When they attempted to locate her, she suddenly appeared from behind a door in the bathroom and lunged at them, holding a knife over her head. At that moment in time, the deputies’ lives were threatened. Exigent circumstances existed to excuse compliance with the ADA. We do not agree with the plaintiff that the deputies created the exigent circumstance. The trial court properly entered summary judgment on this claim as well. We therefore affirm the summary judgment on all claims.

Affinned.

GROSS, C.J., and DAMOORGIAN, J., concur.

. A Baker Act certificate is issued by a physician, clinical psychologist, psychiatric nurse, or other authorized person, who examines a person "and finds that the person appears to meet the criteria for involuntary examination" because "there is reason to believe that the person has a mental illness and because of his or her mental illness ... [tjhere is a substantial likelihood ... the person will cause serious bodily harm to ... herself or others in the near future ...." § 394.463(1), (l)(b)2, and (2)(a)3, Fla. Stat. (2009).

. The expert’s affidavit also reflected concern about the lead deputy's failure to return to the Field Training Officer Program, which was recommended by a supervisor following a 1999 incident. Another supervisor signed off on a form indicating the deputy had completed this training.

. According to the expert, the protocol involves: "(1) [] attempting to calm the situation; (2)[] assuming a non-threatening manner; (3)[ ] moving slowly so as not to excite the individual; (4)[ ] providing assurance that the police are there to help; (5)[ ] communicating with the individual ... (6)[ ] not threatening the individual in any manner; and (7)[ ] gathering any helpful information about the individual from family members.”

. We find the plaintiff's reliance on Allen v. Muskogee, Oklahoma, 119 F.3d 837, 841 (10th Cir.1997) and Grandstaff v. City of Borger, Texas, 767 F.2d 161, 170-72 (5th Cir.1985) misplaced. In Allen, the City was liable because it trained its officers to handle suicidal persons in a manner contrary to proper police procedures and principles. 119 F.3d at 843. In Grandstaff, the City had a policy of disregarding human life and safety. 767 F.2d at 171. Unlike Allen and Grandstaff, there was no proof that the Sheriff’s actual policy was contrary to accepted standards. There was simply insufficient proof to establish the requisite deliberate indifference for an imposition of liability. See Carr v. Castle, 337 F.3d 1221, 1229-30 (10th Cir.2003).

. The plaintiff’s brief fails to address the state law claim against the deputy. As such, the issue has been waived. Polyglycoat Corp. v. Hirsch Distribs., Inc., 442 So.2d 958, 960 (Fla. 4th DCA 1983). Even if the claim had not been waived, there was no evidence that the deputy "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights ....”§ 768.28(9)(a).