DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**SCOT PETERSON,**
Appellant,

v.

**ANDREW POLLACK** and **SHARA KAPLAN,**
as Co-Personal Representatives of the
**ESTATE OF MEADOW POLLACK,** decedent,
Appellees.

No. 4D19-431

[February 12, 2020]

Appeal of nonfinal order from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Patti Englander Henning, Judge; L.T. Case No. CACE 18-009607 (26).

Michael R. Piper and Christopher J. Stearns of Johnson, Anselmo, Murdoch, Burke, Piper & Hochman, P.A., Fort Lauderdale, for appellant.

Joel S. Perwin of Joel S. Perwin, P.A., Miami, and David W. Brill and Joseph J. Rinaldi, Jr. of Brill & Rinaldi, Weston, for appellees.

*ON APPELLANT'S MOTION FOR REHEARING EN BANC,*
*MOTION FOR CERTIFICATION, AND MOTION FOR CLARIFICATION*

GERBER, J.

We deny the deputy's motion for rehearing en banc and motion for certification. However, we grant the deputy's motion to clarify a phrase within our December 18, 2019 opinion, at page 11, to insert the word "alleged" before the word "duty" in the following phrase: "failure to take any action to fulfill his duty of protecting the students and teachers."

We agree with this requested insertion because, according to Florida Rule of Appellate Procedure 9.130(a)(3)(C)(x), the deputy's appeal in this case was limited to our review of the deputy's statutory immunity argument under section 768.29(9)(a), Florida Statutes (2018). The insertion clarifies that we could not, and did not, review the deputy's other argument that he lacked any legally cognizable duty of care in this case.

Based on the foregoing, we substitute the following opinion for the opinion which we issued on December 18, 2019. The insertion appears within the following opinion on page 11.

This appeal arises from the horrific killing of seventeen students and teachers, and the permanent physical and mental injuries which many others suffered, during the shooting rampage at Marjory Stoneman Douglas High School.

Meadow Pollack's parents have sued, among others, the sheriff's deputy who served as the school resource officer, alleging as to the deputy that his negligence materially contributed to their daughter's death.

The deputy filed a motion to dismiss the parents' suit against him. The deputy argued he is immune from suit and liability under section 768.28(9)(a), Florida Statutes (2018), which provides, in pertinent part:

> No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property. . . .

§ 768.28(9)(a), Fla. Stat. (2018).

According to the deputy, the parents' allegations regarding his conduct, even if true, are insufficient to show that, during this tragic event, he acted "in bad faith," "with malicious purpose," or "in a manner exhibiting wanton and willful disregard of human rights [or] safety."

The circuit court issued an order denying the deputy's motion to dismiss. The circuit court's order stated, in summary fashion, "As a matter of law, [the deputy] is not entitled to statutory immunity under section 768.28(9), Florida Statutes."

The deputy has filed this appeal, seeking this court's de novo review of his motion to dismiss on the ground of section 768.28(9) immunity. We have jurisdiction. *See* Fla. R. App. P. 9.130(a)(3)(C)(x).

2

We conclude that the parents' allegations regarding the deputy's conduct, taken as true as we are required to do in this review, would be sufficient for a reasonable trier of fact to conclude that the deputy acted "in bad faith," "with malicious purpose," or "in a manner exhibiting wanton and willful disregard of human rights [or] safety," as those quoted phrases are defined under Florida law. Thus, we affirm the circuit court's denial of the deputy's motion to dismiss the parents' suit against him.

We present this opinion in two sections, with subsections, as follows:

1. The procedural history:
   a. Allegations of the deputy's knowledge of the shooter;
   b. Allegations of the deputy's conduct on the day of the shooting;
   c. The negligence allegations – duty, breach, causation, damages;
   d. The circuit court's order denying the deputy's motion to dismiss;

2. Our review:
   a. Standard of review;
   b. Defining the phrases used in section 768.28(9)(a);
   c. Applying the definitions to the amended complaint; and
   d. Distinguishing the cases arising from the Columbine massacre.

## 1. *Procedural History*

The parents' allegations against the deputy regarding his conduct are presented in their amended complaint. For purposes of this opinion, we present the allegations in the amended complaint as true, viewing all reasonable inferences arising from the parents' allegations in their favor. *See Preudhomme v. Bailey*, 211 So. 3d 127, 132 (Fla. 4th DCA 2017) ("[I]n reviewing a motion to dismiss, a court may not go beyond the four corners of the complaint and must accept the allegations therein as true, viewing all reasonable inferences arising therefrom in favor of the plaintiff.").

## a. *Allegations of the Deputy's Knowledge of the Shooter*

Two years before the shooting, police received a report that the shooter had posted a photograph of himself with guns on a social media website, stating that he planned "to shoot up the school." An investigation revealed that the shooter had knives and a BB gun. This information was provided to the deputy. However, no evidence exists to indicate that the deputy further investigated the matter.

Eighteen months before the shooting, a student reported to the deputy that the shooter, while depressed, had cut himself and ingested gasoline

in an attempt to kill himself. The student further stated that the shooter wanted to buy a gun for hunting, and had drawn a swastika on his backpack next to the words "I hate n-----s." School personnel called a behavioral health facility for assistance. The facility sent a mobile assistance team to evaluate the shooter. The deputy and other school personnel were present during the evaluation. The facility team contended that the shooter did not meet criteria for further assessment. However, the deputy and two guidance counselors concluded that the shooter should be "Baker Acted," that is, forcibly committed for psychiatric evaluation. The deputy said he would search the shooter's home for a gun, and the Florida Department of Children and Families (DCF) was called to investigate.

However, according to a DCF report, the deputy ultimately refused to share any information with DCF about the shooter. The deputy also changed his mind about "Baker Acting" the shooter. Further, no evidence exists that the deputy went to the shooter's home and searched for any firearms.

### b. *Allegations of the Deputy's Conduct on the Day of the Shooting*

At 2:20 pm on the day of the shooting, the deputy, while outside of the school's Building 1, heard a roving campus monitor use the school radio to warn an employee in the school's Building 12, "Got a suspicious subject on campus. Got a black bag in his hands. Keep your eyes open because I think he's going into your building. So . . . be careful."

When the deputy heard this call, he did not immediately order a "Code Red," which would have resulted in the immediate lockdown of all school buildings and indicated a viable active shooting threat on campus. Because the deputy did not order the school to be locked down, the shooter was able to enter Building 12 at 2:21:15 pm.

Seventeen seconds later, at 2:21:32 pm, the shooter began his rampage on Building 12's first floor. The campus monitor radioed the deputy, "There's some crazy shots going on."

Sixty-nine seconds later, at 2:22:41 pm, the deputy began "loping" from Building 1 towards Building 12.

Ten seconds later, at 2:22:51 pm, the campus monitor used a golf cart to pick up the deputy. Somebody using the radio yelled, "Oh, it sounds like fireworks," to which another person responded, "Those ain't fireworks."

Twenty-four seconds later, at 2:23:15 pm, the deputy and the campus monitor arrived at Building 12. They heard more shots. The deputy jumped off the cart and told the campus monitor, "Get out of here . . . go back to the front of the school . . . we got a shooter on campus." However, the deputy did not enter Building 12. Instead, the deputy remained outside, positioning himself out of harm's way between two concrete walls at the building's corner. By that time, the shooter had killed nine people on Building 12's first floor.

Twenty-eight seconds later, at 2:23:43 pm, the deputy radioed the sheriff's dispatch, "Be advised we have possible, could be firecrackers, I think we have shots fired, possible shots fired, 1200 Building." During those twenty-eight seconds, the deputy remained outside.

Forty-seven seconds later, at 2:24:30 pm, the shooter reached the third floor where Meadow Pollack and others were located. During those forty-seven seconds, the deputy remained outside.

Five seconds later, at 2:24:35 pm, the shooter shot Meadow Pollack multiple times.

Forty-one seconds later, at 2:25:16 pm, the shooter again shot Meadow Pollack multiple times. Meadow Pollack was killed, as were seven others on Building 12's third floor.

While the deputy remained outside Building 12, he heard about seventy shots coming from the building. Sometime during that period, the deputy radioed, on multiple occasions, for the school to be locked down while the shooter remained inside Building 12. On one occasion, the deputy stated, "We're in total lockdown right now. Nobody's leaving the school, everybody's in lockdown." According to the amended complaint, the lockdown prevented students and teachers from escaping Building 12.

Almost two minutes later, at 2:27 pm, the deputy, still in his safe location, advised dispatch, "Make sure I have a unit over in the front of the school, make sure no one comes inside the school." The deputy then advised dispatch, "Broward. Do not approach the 12 or 1300 building, stay at least 500 feet away at this point."

Also at 2:27 pm, a Coral Springs officer arrived at the school.

Two minutes later, at 2:29 pm, the Coral Springs officer found the deputy in his safe position outside Building 12. According to the amended

complaint, the deputy said he did not know the shooter's location, and told the Coral Springs officer to "get [the deputy's] six," meaning "watch my back." Thus, the Coral Springs officer did not attempt to confront the shooter.

At 2:32 pm, other law enforcement personnel arrived at Building 12 and entered the building. By that time, the killing spree was over.

### c. *The Negligence Allegations: Duty, Breach, Causation, Damages*

Regarding duty of care, the amended complaint alleged various means by which the deputy's duty of care arose. Relevant to this appeal is only the following allegation of the deputy's duty of care: "[The deputy] irrefutably owed a duty of care to MEADOW POLLACK to have done by 2:23:15 what [the Broward County sheriff] said and police tactics for responding to an active shooting incident have mandated since Columbine: Enter Building 12, address the killer and kill the killer."

The amended complaint then described the alleged grounds from which this duty of care arose:

> 102. [Some time before the day of the shooting, the deputy] underwent the Broward Sheriff's Office active-shooter training program.
>
> 103. [Some time before the day of the shooting, the deputy] received at least one refresher training in Broward Sheriff's Office active-shooter training program.
>
> . . . .
>
> 105. According to [the deputy's] training, Broward Sheriff's Office Department of Law Enforcement Standard Operating Procedures 4.37.2(C): "If real time intelligence exists[,] the sole deputy or a team of deputies may enter the area and/or structure to preserve life. A supervisor's approval or on-site observation is not required for this decision."
>
> . . . .
>
> 113. [After the shooting, the sheriff] held a press conference after reviewing the footage of [the deputy's] pusillanimity [during the event] . . . . When asked what [the deputy] should have done when gunfire broke out at the Parkland school . . .

6

[the sheriff] likewise aptly said [the deputy] should have gone into the building and "[a]ddressed the killer. Killed the killer."

. . . .

115. Continuing in his interview . . . [the sheriff] rightly recognized: "We push to the entry, to the killer. We get in, and we take out the threat."

. . . .

117. In fact, ever since the 1999 attack at Colorado's Columbine High School, authorities dictating police tactics for responding to active-shooting incidents have emphasized the importance of law enforcement personnel pursuing the attacker or attackers quickly in an effort to eliminate the threat and prevent additional deaths.

118. "Columbine resulted in new approaches in which patrol officers are being trained to respond to active shooters as quickly as possible," the Police Executive Research Forum, a think tank backed by major-cities chiefs, wrote in a 2014 report.

Regarding the deputy's alleged breach of the duty of care, the amended complaint summarized that the deputy committed one or more of the following acts or omissions:

a. Failing to call [a] Code Red;

b. Failing to intercept [the shooter before the shooter entered Building 12];

c. Failing to enter Building 12;

d. Failing to attempt to take out [the shooter];

e. Failing to attempt to neutralize [the shooter];

f. Failing to attempt at saving a single life but his own;

g. Failing to respond [to] those victims relying upon him for protection;

7

h. Failing to give proper information to arriving law enforcement personnel;

i. Failing to exercise reasonable care in the fulfilment of the duties he undertook to protect; and/or

j. Failing to follow the policies and procedures reasonably calculated to mitigate, reduce and/or eliminate the risk of the injuries and harm during an active shooting.

Regarding causation, the amended complaint alleged (under the "but for" causation standard):

122. Had [the deputy] entered Building 12, addressed [the shooter] and killed [the shooter], MEADOW POLLACK would not have been shot and killed.

. . . .

138. If [the deputy] had not provided the misinformation to [the Coral Springs officer] and had not told [the Coral Springs officer] to "watch [the deputy's] six," then [the Coral Springs officer] would have entered [Building 12], confronted [the shooter], and killed [the shooter] before [the shooter] shot Meadow Pollack.

Regarding damages, the amended complaint alleged, "As a result of [the deputy's actions and omissions] . . . which caused the shooting and killing of MEADOW POLLACK, [her parents] suffered damages, including, but not limited to: mental pain and suffering from the date of injury. . . ."

Anticipating that the deputy likely would raise a section 768.28(9)(a) immunity defense, the amended complaint sought to counter that defense by alleging that the deputy's conduct was committed "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."

### d. *The Circuit Court's Order Denying the Deputy's Motion to Dismiss*

As stated above, the deputy filed a motion to dismiss the parents' suit against him. The deputy argued that under section 768.28(9)(a), he is immune from suit and liability because the amended complaint's allegations are insufficient to show that he acted "in bad faith or with

malicious purpose or in a manner exhibiting wanton and willful disregard of human rights [or] safety."

The circuit court issued an order denying the deputy's motion. The order stated, in summary fashion, "As a matter of law, [the deputy] is not entitled to statutory immunity under section 768.28(9), Florida Statutes."

This appeal followed.

## 2. *Our Review*

### a. *Standard of Review*

On appeal, the deputy maintains his argument that section 768.28(9)(a) immunity bars the parents' suit. According to the deputy, even accepting the parents' allegations as true, his alleged conduct in responding to the shooting was not "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights [or] safety."

Our standard of review is de novo. *See Keck v. Eminisor*, 104 So. 3d 359, 366 (Fla. 2012) (whether a state employee or agent is entitled to section 768.28(9)(a) immunity is a pure question of law reviewed de novo); *Execu–Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*, 752 So. 2d 582, 584 (Fla. 2000) ("A trial court's ruling on a motion to dismiss based on a question of law is subject to de novo review.").

As with the review of any motion to dismiss, we look only to the four corners of the parents' amended complaint, accept their allegations as true, and view all reasonable inferences arising therefrom in their favor. *See Preudhomme*, 211 So. 3d at 132 ("[I]n reviewing a motion to dismiss, a court may not go beyond the four corners of the complaint and must accept the allegations therein as true, viewing all reasonable inferences arising therefrom in favor of the plaintiff.").

The question of law which we consider is whether the amended complaint has sufficiently pled allegations which, if true, would permit a reasonable trier of fact to find that the deputy acted "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights [or] safety," as those phrases are used in section 768.28(9)(a). *Cf. Furtado v. Yun Chung Law*, 51 So. 3d 1269, 1277 (Fla. 4th DCA 2011) (in determining whether a state employee or agent is entitled to summary judgment on section 768.28(9)(a) immunity, the question is whether a reasonable trier of fact could possibly conclude that the conduct would fall within the exceptions to the statute).

9

## b. *Defining the Phrases Used in Section 768.28(9)(a)*

The initial hurdle which we face is that the Florida Statutes do not define the phrases "in bad faith" or "with malicious purpose" or "in a manner exhibiting wanton and willful disregard of human rights [or] safety," as those phrases are used in section 768.28(9)(a).

Thus, we must examine how courts have interpreted those phrases under Florida law, so that we may apply those interpretations to the amended complaint's allegations here.

The phrase "bad faith," as used in section 768.28(9)(a), has been "equated with the actual malice standard." *Parker v. State of Fla. Bd. of Regents ex rel. Fla. State Univ.*, 724 So. 2d 163, 167 (Fla. 1st DCA 1998) (citation omitted).

The phrase "malicious purpose," as used in section 768.28(9)(a), has been interpreted as meaning the conduct was committed with "ill will, hatred, spite, [or] an evil intent." *Eiras v. Florida*, 239 F. Supp. 3d 1331, 1343 (M.D. Fla. 2017) (citation and internal quotation marks omitted). Or perhaps stated more simply, "the subjective intent to do wrong." *Id.* at 1345 (citation omitted).

The phrase "wanton and willful disregard of human rights [or] safety," as used in section 768.28(9)(a), has been interpreted as "conduct much more reprehensible and unacceptable than mere intentional conduct," *Richardson v. City of Pompano Beach*, 511 So. 2d 1121, 1123 (Fla. 4th DCA 1987), and "conduct that is worse than gross negligence," *Sierra v. Associated Marine Insts., Inc.*, 850 So. 2d 582, 593 (Fla. 2d DCA 2003) (citation and internal quotation marks omitted).

While *Richardson* and *Sierra* may provide what "wanton and willful disregard of human rights [or] safety" is "more than" or "worse than," neither of those references, nor any other case which we have reviewed, have interpreted what "wanton and willful disregard of human rights [or] safety" *actually means* as used in section 768.28(9)(a).

Thus, we have investigated other sources for guidance. We have observed that the Florida Supreme Court has defined the words "wanton" and "willful" in standard jury instructions for three other types of crimes. Although those other crimes are not necessarily comparable to the horrific crimes in this case, those crimes' definitions of "wanton" and "willful," as used in the standard jury instructions, appear sufficiently analogous to

10

allow us to offer a legally acceptable interpretation of "wanton and willful disregard of human rights [or] safety" as used in section 768.28(9)(a).

Under those standard jury instruction definitions, "wanton" means "with a conscious and intentional indifference to consequences and with the knowledge that damage is likely to be done to persons or property." "Willful" means "intentionally, knowingly and purposely." *See*, *e.g.*, Fla. Std. Jury Instr. (Crim.) 7.9 (Vehicular or Vessel Homicide); Fla. Std. Jury Instr. (Crim.) 28.5 (Reckless Driving); Fla. Std. Jury Instr. (Crim.) 28.19 (Reckless Operation of a Vessel).

We accept those standard jury instruction definitions as sufficient to define the meanings of "wanton" and "willful" as used in section 768.28(9)(a)'s phrase "wanton and willful disregard of human rights [or] safety."

Having determined the definitions to be applied to the phrases "in bad faith," "with malicious purpose," and "in a manner exhibiting wanton and willful disregard of human rights [or] safety," as used in section 768.28(9)(a), we now apply those definitions to the allegations contained in the four corners of the parents' amended complaint.

### c. *Applying the Definitions to the Amended Complaint*

We address the "wanton and willful disregard" standard first, as that standard clearly is the most applicable to the amended complaint's allegations here. All of the amended complaint's allegations describing the deputy's actions and omissions, if true, appear sufficient to permit a reasonable trier of fact to conclude that the deputy acted "in a manner exhibiting wanton and willful disregard of human rights [or] safety." That is, a reasonable trier of fact could find that the deputy's failure to confront the shooter, and failure to take any other action to fulfill his alleged duty of protecting the students and teachers, while choosing to remain outside in a protected location to ensure his own safety, constituted "a conscious and intentional indifference to consequences and with the knowledge that damage is likely to be done to persons," which the deputy committed "intentionally, knowingly and purposely."

Application of the "bad faith" and "malicious purpose" standards is a closer call. Other than the amended complaint's conclusory allegation that the deputy's actions and omissions, in general, were committed "in bad faith or with malicious purpose," the amended complaint contains no specific allegation describing how the deputy's conduct fit those

11

synonymous phrases' definitions of acting with "ill will, hatred, spite, [or] an evil intent" or with "the subjective intent to do wrong."

Nevertheless, viewing all reasonable inferences arising from the parents' amended complaint in their favor, *Preudhomme*, 211 So. 3d at 132, we can foresee how a reasonable trier of fact could find that the deputy's alleged conduct, in certain respects, meets those standards. We will discuss two examples which we have inferred from the amended complaint's allegations.

First, the amended complaint alleges that while the shooter remained inside Building 12, during which the deputy allegedly heard about seventy shots coming from the building, the deputy chose to remain outside in a protected location, and radioed on multiple occasions for the school to be locked down. According to the parents' amended complaint, the lockdown prevented students and teachers from escaping the building. If that allegation is proven to be true, then we can foresee an argument being made to the trier of fact that the deputy ordered the lockdown to better ensure his own safety, even though he would have recognized that he was simultaneously increasing the danger to the students and teachers who now were trapped in the building with the shooter.

Second, the amended complaint alleges that when the Coral Springs officer found the deputy in his safe position outside Building 12, the deputy misinformed the Coral Springs officer that he did not know the shooter's location, and told the Coral Springs officer to "get my six," meaning "watch my back." If that allegation is proven to be true, then we can foresee an argument being made to the trier of fact that the deputy gave those instructions to better ensure his own safety, even though he would have recognized that he was preventing the Coral Springs officer from potentially saving lives inside Building 12.

By citing these two examples, we do not mean to suggest that, at trial, the parents would be limited to these two examples in seeking to prove that the deputy's actions were committed "in bad faith or with malicious purpose." If discovery reveals that the deputy committed other actions and omissions "in bad faith or with malicious purpose," then the parents may seek to prove those actions also meet these thresholds.

We also believe it is worthwhile to remind the parties and the circuit court that although the definitions of "in bad faith" and "with malicious purpose" appear to be synonymous with each other under Florida law, those two phrases are not synonymous with the phrase "in a manner exhibiting wanton and willful disregard of human rights [or] safety." *Cf.*

*Thompson v. Douds*, 852 So. 2d 299, 309 (Fla. 2d DCA 2003) ("Here, while there is no evidence that the individual officers acted in bad faith or with a malicious purpose, there is a genuine issue of material fact as to whether the individual officers' actions constituted a wanton and willful disregard of human rights."). Thus, special interrogatory verdicts for each phrase may be advisable at trial, to avoid application of the "two-issue rule." As our supreme court stated in *Barth v. Khubani*, 748 So. 2d 260 (Fla. 1999):

> [A]lthough it may seem that injustice might result from application of the "two issue rule," the rule is an economical tool that limits appellate review to issues that actually affect the case and that *litigants may avoid application of the rule by simply requesting a special verdict that would illuminate the jury's decision making process and the [e]ffect of any alleged error*[.] *It should be remembered . . . that the remedy is always in the hands of counsel.*

*Id.* at 261 (emphasis added; citation and internal quotation marks omitted).

### d. *Distinguishing the Cases Arising from the Columbine Massacre*

In support of reversal, the deputy relies on two companion cases arising from the similarly horrific Columbine High School massacre – *Schnurr v. Board of Cty. Comm'rs of Jefferson Cty.*, 189 F. Supp. 2d 1105 (D. Colo. 2001), and *Rohrbough v. Stone*, 189 F. Supp. 2d 1088 (D. Colo. 2001).

In *Schnurr* and *Rohrbough*, the family members of those killed, as well as injured survivors, sued the sheriff and the responding deputies based on their alleged "willful and wanton misconduct" during their response to the attack. But in both cases, the Colorado federal district court granted the sheriff's and deputies' immunity-based motions to dismiss the actions.

We choose not to follow *Schnurr* and *Rohrbough* here, because both cases ultimately are distinguishable from the instant case.

To explain our reasoning, we first will describe *Schnurr* and *Rohrbough* in greater detail. To simplify our description, we have merged both cases' allegations into the following combined summary.

In both cases, the complaints alleged that the gunmen began the attack while still outside of the school, by shooting students located on the school's grounds. Sheriff's deputies, including a deputy serving as the

13

school resource officer, quickly arrived and began exchanging shots with the gunmen on the grounds. The gunmen then entered the school.

The deputies heard gunshots and explosions inside the school. Students running out of the school told the deputies that the gunmen were shooting students. None of the students reported that the gunmen had taken, or were threatening to take, hostages. Thus, the deputies knew they were confronting a "high-risk" situation, rather than a hostage situation, as defined by the sheriff's department's manual.

A few minutes later, a City of Denver police SWAT team, not affiliated with the county sheriff's office, arrived. The SWAT team, trained to handle high-risk situations, allegedly were prepared and willing to use their special weapons and tactics to respond to the attack.

As the SWAT team positioned themselves outside of the exterior door where the gunmen had entered the school, one of the gunmen pointed a long-barrel weapon out of the door and fired a number of rounds. The SWAT team returned fire. The gunman went back into the school. The SWAT team advanced toward the door.

However, the sheriff's deputies ordered the SWAT team not to enter the school. According to the complaints, the deputies either were enforcing an order communicated from the sheriff or his command personnel, or were enforcing the sheriff's department's policy or practice of establishing a secure perimeter when presented with a high-risk situation.

Consistent with this order to secure the perimeter, no law enforcement officer entered the school to attempt a rescue.

In the meantime, a teacher in the library called 911. The teacher said she and several students were in the library, and the gunmen were firing shots in the hallway outside of the library. The 911 operator, who was in direct contact with the sheriff and the deputies on scene, conveyed the teacher's information to them.

According to the complaints, the deputies could see that the library's exterior door to the school grounds was open, and knew that the teacher and students could use that door to escape from the library in less than one minute. However, the deputies did not attempt to have the teachers and students escape from the library.

Instead, the deputies remained outside while the 911 operator, either based on her training, or based on instructions from the sheriff and the

14

deputies, told the teacher that help was on the way. The 911 operator also told the teacher to "keep everyone low to the floor," i.e., stay in the library.

Approximately five minutes into the 911 call, the gunmen entered the library and began shooting several students, killing five of them. The deputies never made any effort to rescue the students. Rather, they maintained their secure perimeter and continued to prevent the SWAT team and other potential rescuers from entering the school.

According to the complaints in both cases, the actions and omissions described above enhanced the danger to the students, by inducing the students to remain in the library, rather than trying to escape outside.

In both cases, the sheriff and the deputies moved to dismiss the lawsuits against them as barred by the Colorado Governmental Immunity Act, section 24–10–101, et seq., Colorado Statutes (1999).

The Colorado act provides, in pertinent part, that a public employee may only be held liable for conduct that is "willful and wanton":

> A public employee shall be immune from liability in any claim for injury . . . which lies in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by a claimant and which arises out of an act or omission of such employee occurring during the performance of [the employee's] duties and within the scope of [the] employment *unless the act or omission causing injury was willful and wanton.*

§ 24–10–118(2)(a), Colo. Rev. Stat. (1999) (emphasis added).

The Colorado federal court granted the sheriff's and deputies' motion to dismiss.

In its reasoning, the Colorado federal court initially recognized that the phrase "willful and wanton" is not defined in the Colorado act. Thus, the Colorado federal court construed Colorado state court case law to mean that for a public employee's conduct to be "willful and wanton" under the Colorado act, that public employee "must be adequately alleged to have purposefully pursued a course of action or inaction that he or she considered would probably result in the harm [which occurred]." *Schnurr*, 189 F. Supp. 2d at 1139-40; *Rohrbough*, 189 F. Supp. 2d at 1098.

15

Applying that definition to the complaints' allegations in both cases, the Colorado federal court dismissed the wrongful death actions against the sheriff and the deputies for the following reasons:

> Under circumstances where [the gunmen] were just observed shooting at people outside the library's exterior [door], the [Sheriff/Law Enforcement] Defendants' failure to attempt a rescue of the Library [Victims/Plaintiffs] through the exterior [door] and, in essence, telling them to stay put, does not, as a matter of law, amount to willful and wanton conduct.  In addition, while the . . . Defendants' decision to "secure the perimeter" and not enter the School might in hindsight constitute negligence or arguably gross negligence, I conclude that the . . . Defendants' actions or omissions do not constitute willful and wanton conduct sufficient to abrogate governmental immunity under Colorado law.

*Schnurr,* 189 F. Supp. 2d at 1140; *Rohrbough,* 189 F. Supp. 2d at 1098.

*Schnurr* and *Rohrbough* are distinguishable from the instant case in two respects.

First, as mentioned above, in *Schnurr* and *Rohrbough*, the complaints alleged that the deputies ordered the SWAT team not to enter the school because the deputies were either following orders or following a pre-determined (though tragically flawed) plan on how to respond to this type of situation, causing the Colorado federal court to conclude that the sheriff and the deputies did not purposefully pursue a course of action or inaction which would probably result in the harm which occurred.

Here, however, the parents' amended complaint alleged that the deputy's choice to remain outside Building 12, while the shooter moved unimpeded from the first floor to the third floor, ran *counter to* the deputy's training regarding how to address an active-shooter situation, post-Columbine.  In other words, based on the tragic lessons learned from Columbine, not only did the sheriff's procedures manual provide that the deputy had the authority, without a supervisor's approval or on-site observation, to enter the building to preserve life, the deputy had been trained to pursue the shooter quickly to eliminate the threat and prevent additional deaths.  Thus, a reasonable trier of fact could find that the deputy, by *not acting* as he was trained, and instead placing his own safety above that of the students and teachers, had "the subjective intent to do wrong," and "intentionally, knowingly and purposely" chose to remain outside Building 12 "with a conscious and intentional indifference to

16

consequences and with the knowledge that damage [was] likely to be done" to the students and teachers inside Building 12.

Second, the Colorado federal court, in weighing the deputies' decision not to attempt to rescue the library victims through the library's exterior door, and instead telling the library victims to stay put, specifically noted that the deputies had just observed the gunmen shooting at people outside the library's exterior door. The Colorado federal court apparently concluded the deputies had valid reasons to believe that an escape attempt through the library's exterior door would probably result in greater harm than the possible harm from directing the library victims to stay put.

Here, however, the parents' amended complaint alleged that after the deputy arrived at Building 12, he had *no valid reason* to remain outside the building, other than to protect himself. Before the deputy arrived at Building 12, he had heard the campus monitor warn an employee in Building 12 that the shooter was going into that building. One minute later, the campus monitor radioed the deputy that shots were being fired. Ninety seconds after that, the deputy arrived at Building 12 and heard more shots coming from inside the building. In sum, to the best of the deputy's knowledge, the shooter was confining his destruction to inside Building 12, and thus the deputy had *no reason* to remain outside Building 12, other than to protect himself and not the students and teachers inside Building 12. Thus, a reasonable trier of fact could find that the deputy, by placing his own safety above that of the students and teachers, had "the subjective intent to do wrong," and "intentionally, knowingly and purposely" chose to remain outside Building 12 "with a conscious and intentional indifference to consequences and with the knowledge that damage [was] likely to be done" to the students and teachers.

### *Conclusion*

Based on the foregoing, we conclude that the parents' allegations regarding the deputy's conduct, taken as true as we are required to do in this review, would be sufficient for a reasonable trier of fact to conclude that the deputy acted "in bad faith," "with malicious purpose," or "in a manner exhibiting wanton and willful disregard of human rights [or] safety," as we have interpreted those phrases under Florida law. Thus, we affirm the circuit court's denial of the deputy's motion to dismiss the parents' suit against him based on section 768.28(9)(a) immunity.

*Affirmed.*

TAYLOR and CIKLIN, JJ., concur.

\*         \*         \*

*Not final until disposition of timely filed motion for rehearing.*